[Cite as *State v. Allison*, 2016-Ohio-5262.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 26885 |
| | : | |
| v. | : | T.C. NO. 15CRB949 |
| | : | |
| MICHAEL A. ALLISON | : | (Criminal appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the 5th day of August, 2016.

. . . . . . . . . .

RYAN BRUNK, Atty. Reg. No. 0079237, 125 W. Main Street, New Lebanon, Ohio 45345
        Attorney for Plaintiff-Appellee

MICHAEL A. PARTLOW, Atty. Reg. No. 0037102, 112 S. Water Street, Suite C, Kent, Ohio 44240
        Attorney for Defendant-Appellant

. . . . . . . . . . . . .

DONOVAN, P.J.

{¶ 1} This matter is before the Court on the Notice of Appeal of Michael "Tony" Allison, filed October 22, 2015. Allison was found guilty of assault, in violation of R.C. 2903.13, a misdemeanor of the first degree, on August 18, 2015, following a bench trial

in Montgomery County Municipal Court, Eastern Division. Allison was sentenced to 90 days in jail, with 70 days suspended, and his sentence was stayed pending appeal.[1] The State did not file a brief in response.

{¶ 2} Darnell Williams signed a complaint against Allison on June 27, 2015, alleging that Allison assaulted him at a Marathon gas station on Old Troy Pike in Huber Heights. At trial, Williams testified that he resides in Piqua, and on the date of the incident he, Brandon Thompson and Alicia Hoskin went to Wright Corner and MJ's Café in Dayton, which are bars that serve alcohol. Williams stated that in the course of the night, he consumed four drinks. According to Williams, Hoskin left him and Thompson at MJ's Café, and they had to "go run out of the bar to find her." Williams stated that Hoskin "came whipping around the corner and pulled up to the curb and then we were like there she is and then we got in the car." Williams testified that he "was there to keep Brandon company. Those two were doing their thing. I was just off to the side doing my thing."

{¶ 3} While in the car, Williams stated that Hoskin "just started yelling at me because I wasn't looking her in the eye and * * * she thought that I was on a date with Brandon and that's not what happened. And she was saying things to him like * * * you can do better than him, blah, blah, blah. I didn't know what she was talking about." Williams stated that he and Hoskin argued, and "she tried to pull over on I-70 and put me out of the car in the middle of a thunderstorm and I said I am not getting out of this car on the interstate. I called someone to come and get me." Williams stated that Hoskin then

---

[1] We note that Allison's September 29, 2015 "Indirect Sentencing Entry" incorrectly provides that Allison pled guilty to assault.

drove to the Marathon gas station "right off the exit" in Huber Heights.

{¶ 4} Williams stated that Hoskin exited the car and went into the gas station, and that he remained in the vehicle until his friend Marcus Smith, whom Williams phoned from the interstate, arrived to pick him up. Williams stated that he was not aware of anyone else at the gas station, and that when he observed Smith's car arrive, he "stepped out of the vehicle with my bags of Taco Bell. I take a couple of steps towards Marcus's car, and I was attacked by that gentleman." According to Williams, he "started walking towards Marcus's car and all of a sudden someone was there and just starts punching me in the face and knocked me to the ground." Williams stated that he was punched several times with a closed fist. Williams testified that Allison "still tried to hit me with the fist so I wrapped my legs around him and I pulled him to the ground. He's still trying to hit me." Williams stated that he "As soon as I got advantage point, * * * I bit down and he got off of me." Williams further testified that he bit Allison in the abdominal area. When asked if he struck Allison, Williams stated, "No. I was getting him off of me." After the incident, Williams stated that his "jaw was locked up. I had a big bruise on my rib cage where he tried to kick me and * * * the inside of my cheek was cut and I was obviously bleeding on my face." He identified Allison as his assailant.

{¶ 5} Brandon Thompson testified that he has known Hoskin for seven years and Williams for 14 years. On the night of the incident, Thompson stated that he had "[a]t least three or more" drinks and he was intoxicated. Thompson stated that Hoskin tried to leave him and Williams at MJ's, but that he called to her as she left and she "ended up picking us up." Thompson stated that Hoskin drove to Taco Bell and then to Interstate 70. He stated that "Darnell was being quiet at first. She just - - for whatever reason,

she didn't like him. And it was exposed in that car ride on 70. She pulled off the side of the interstate and told him to get out." Thompson testified that Williams refused to exit the vehicle, and that Thompson "said why don't you just go up to the next intersection and then you'll let him out and, you know, this will be done and over with. Because I could tell she was upset. At that point he was upset. And there was no reason leaving someone on the side of the interstate in the middle of the night."

{¶ 6} Thompson stated that when they arrived at the Marathon station, Hoskin went inside and he followed her. Thompson stated that Hoskin was "on the phone. I didn't know at the time who she was on the phone with." Thompson stated that he returned to the vehicle and "had the door open and was getting ready to shut it to go back into the gas station when Darnell's ride pulled up. He got out of Alicia's vehicle and that's when I saw Tony." Thompson stated that Williams exited the vehicle carrying his Taco Bell purchase and "Anthony just started swinging and hitting on him." Thompson stated that Williams did not swing first, and that both men went to the ground. According to Thompson, "Alicia came from the gas station screaming Anthony, stop. Anthony, stop." After the fight ended, Thompson stated that Williams got into the vehicle and "drove across the street. * * * Next thing I know the cops were there. Darnell and his ride came back across the street and there was statements filled out." Thompson identified Allison as Williams' assailant.

{¶ 7} On cross-examination, Thompson stated that Hoskin was drinking on the night of the incident, that "she had drank before we even left," and that she continued drinking at the bars. Thompson stated that Williams "didn't drink at MJ's." Thompson denied that Williams yelled at Hoskin and called her names. He stated that Williams

"was talking directly to me. He said you need to explain to her our friendship." Thompson stated that it was not raining when Hoskin ordered Williams out of her car on the interstate. He testified that once at the gas station, Hoskin did not tell Williams to get out of her car.

{¶ 8} Marcus Smith testified that Williams phoned him at approximately 2:00 a.m. on the date of the incident and "asked me to come and get him to pick him up because he was at the gas station and was going to be stranded there." Smith stated that he received a text from Williams prior to the phone call. Smith stated that his home is a five minute drive from the station. Upon arrival, Smith stated that he "looked and [Williams] was in a vehicle on the right, talking to one of his friends. And as soon as he saw me, he got out of the vehicle with his belongings and started to walk to my vehicle." According to Smith, he "started to open the door for [Williams] and I saw someone who I did not know coming across the parking lot and just started bashing him in the face." According to Smith, Williams was punched "several times in the face with a closed fist." He identified Allison as the assailant.

{¶ 9} Alicia Hoskin testified that she was "the designated driver" on the night of the incident. She stated that she "had probably two glasses of wine before we went out and that's it." According to Hoskin, after leaving the bars downtown, the group "stopped at Taco Bell and [Williams] started to cuss at the person that was taking our order as we were sitting in the drive-thru and I asked him to stop or he needed to get out of the car." Hoskin stated that Williams "was calling me a b**** and he told Brandon that he needed to shut me up or something was going to happen." Hoskin stated that Williams refused to get out of the car on the interstate, and that she then drove to the Marathon station,

where she "opened the door and I said you're no longer welcome in my car and he grabbed the door and slammed it in my face and he said I'm not getting out of the car until you take me back to Brandon's car, b****, and stayed in the car. So I went inside the gas station and stood until Tony came." Hoskin stated that she phoned Allison for a ride, and he arrived in "[m]aybe 15 minutes; maybe. Not even."

{¶ 10} Hoskin stated that she was "in the gas station because I'm scared. I don't know him. This is the first time I've seen him in my life. And my friend, who's been my best friend, hasn't been sticking up for me or telling him to get out of the car. He's trying to coax me to get back in the car to drive them back to my house where his vehicle's at and I won't get back in the car." According to Hoskin, Allison "pulls up and I go to his car and I sit in his car and Tony is like, okay, I'm going to go over there. So as soon as Tony started walking over there [sic]. He gets about five feet from the car and the guy jumped out at him." Hoskin stated that Williams "was like a ninja." Hoskin testified that she observed "them both go to the ground and when I come over there, the guy's on Tony's stomach, like biting on it, and he can't - - like Tony can barely even stand up. He's hanging from him with his teeth." When asked how much Williams drank in the course of the evening, Hoskin stated that he had "at least two glasses of wine at my house, two or three vodka and cranberries at MJ's and a shot with Brandon," as well as another shot at the second bar. Hoskin stated that after the incident, Allison called the police. Hoskin stated that Smith arrived after the altercation ended.

{¶ 11} On cross-examination, Hoskin identified the statement she provided to the responding police officers and acknowledged that it provides that when Williams got out of her vehicle "they immediately fought," and that she "didn't see who threw the first hit."

She testified that she "didn't see anybody hit anybody. I just saw him jump out of the car." Hoskin stated that Williams had his Taco Bell purchase in his lap at the time he jumped from the car, and "Taco Bell went flying everywhere."

{¶ 12} Allison testified that on the night of the incident he received a call from Hoskin who told him "there was a gentleman in her car that she didn't know and she wanted him out and he refused to get out." Allison stated that Hoskin "was crying on the phone" and told him that Williams had been calling her names. He testified that he lives five to eight minutes from the gas station. According to Allison, he phoned Hoskin to tell her he was on his way, "and then she told me that he had been calling her names, calling her b**** and told, you know, Brandon, you better shut this b**** up or something is going to happen." Allison stated that when he "pulled in, I didn't see her and I pulled out and she walked out of the gas station and walked over to - - like on by Kroger's there. She got in my car. She said he's in my car and he's - - you know, he won't get out." The following exchange occurred:

Q. * * * Then what did you do after you talked to her at the station?

A. I went up to the car to see what was going on and while I got - - right before the car, he jumps out of the car and, you know, he - - I mean, he - - he's not a little dude. I mean, he come out of the car at me so - -

Q. Did you hit him or was it more of a struggle?

A. He came at me. I grabbed him by the (indiscernible) and I threw him on the ground. I threw him on his back and that's when he bit me.

Q. He bit you twice, didn't he?

A. Yeah.

Q.   Two pretty good-sized bite marks?

A.   Yeah.

Q.   After the incident - - by the way, was there another car there that somebody had pulled up, a friend of his that he might have called?

A.   Not until after we got up and my - - I was calling the police.

{¶ 13}   The following exchange occurred on cross examination:

Q.   At some point in time though you decide even though you have Allison (sic) in your car, does she tell you that she gave them the keys to leave?

A.   I'm not sure she did then or not.   But afterwards I know they had the keys, yeah.

Q.   So - - but she was in your car safe but you decided to walk over there and confront them anyway?

A.   Well, it's her car, you know.   And he wouldn't get out of the car. So I was going to - - she needed - - you know, she needs her car.

Q.   So you were going to go fix the situation?

A.   Plus they had the keys.   Yes.

Q.   And it's your testimony, even though three witnesses have testified that you came over and struck Darnell, that you in no way struck Darnell first?

A.   Did I strike him first?   No, he came at me.   Yes.

Q.   Well, let's - - explain that.   So - - well, let's go back to that.   Did you strike him first?

A.   I don't think there was a punch.   I threw him on the ground, yes.

Q.   * * * So now let's talk about him jumping out of the car. Describe that for the Court.

A. * * * I got within - - from closer to me and you and the door opens and he flies out of the car.   Taco Bell flew everywhere.   Alicia is the one who cleaned it up.

Q.   So did he have anything in his hands?

A.   Not that I'm aware of.

Q. So Taco Bell goes flying off his lap according to you.   And does he come and get in your face?

A.   He just came at me.   That's when I grabbed him by - - underneath the shoulder and slammed him on the ground.

Q.   Did he ever strike you?

A.   There was multiple punches thrown by both, yes.

Q.   How about when he initially got out of the car.   Did he come at you with his hand up or fist or - -

A.   He came at me aggressively.

Q.   Well, describe that. I would like to know what that means.

A.   I don't know if he was throwing a punch or what, but he came - - he came at me and I grabbed him and threw him on the ground, yes.

Q.   Well, normally if someone is going to throw a punch, their arm would be raised, correct?

A. I mean, depends on how you throw a punch, I guess. I'm not sure.

Q. Well, I guess you were - - you were not expecting an upper cut, is that the only punch that is thrown from probably a lower angle?

A. I wasn't expecting a punch anywhere.

Q. You weren't expecting a punch?

A. No. I wasn't expecting a punch when I walked up to the car, no. Until he got out of the car, then I know (sic) it was going to happen then.

Q. * * * And I want you to describe why you felt so threatened, that in your own words you're just going to take him to the ground?

A. She asked him to get out of the car several times. He called her all kinds of names. So obviously there is aggression towards him. He gets out of the car aggressively at me and comes at me. I grabbed him and threw him on the ground.

Q. * * * So you - - you came there to help Alicia. You were upset. You were going to get him out of the car, right?

A. That wasn't my intention, no. My intention was to go tell Brandon to get him out of the car. The whole thing could have been stopped if Brandon would have said, hey, dude, shut up.

Q. But you think he's upset because he's threatened Alicia?

A. Correct.

Q. So you think he may bow up when you get there, right?

A. I hadn't a clue, yeah. * * *

Q. * * * You weren't prepared for that?

A. I wasn't prepared for - - to a fight (sic), no.

Q. * * * And again, it's your testimony today that you threw him to the ground first but you never struck him before he struck you?

A. I threw him to the ground first, yes.

{¶ 14} At the conclusion of the trial, the court indicated as follows:

* * *

Based upon the testimony of the witnesses, the Court makes a finding of guilty. I will say that I think that there is a little bit of massaging on the part of the State's witnesses as to what their condition was and to what happened, but the defendant did admit that when the gentleman got out of the car and approached him in whatever manner one wishes to characterize it, he did throw him to the ground. So, first, we will make a finding of guilty. * * *

{¶ 15} Allison's sole assignment of error is as follows:

THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 16} According to Allison, "the Appellee's witnesses agree with one another about very little," such as the amount of alcohol Williams consumed on the night of the incident. Allison asserts, "Darnell essentially admitted to a felony carjacking in that he had no problem indicating he refused to leave Alicia's vehicle when requested to do so." Allison asserts that his testimony and Hoskin's were consistent. Allison asserts that if "the trier of fact believes that an individual feels threatened by the aggressive approach

of another, from only a few feet away, it is axiomatic that the threatened individual may take affirmative action to protect himself. There is no finding and nothing in the record to indicate that the Appellant's actions were anything but reasonable."

**{¶ 17}** As this Court has previously noted:

> A weight-of-the-evidence argument "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *see Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion"). When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

> Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render the conviction against

the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

*State v. Quarles*, 2015-Ohio-3050, 35 N.E.3d 616, ¶ 4-5 (2d Dist.).

{¶ 18} R.C. 2903.13(A) provides: "No person shall knowingly cause or attempt to cause physical harm to another * * *."

{¶ 19} As this Court has previously noted:

"Under Ohio law, self-defense is an affirmative defense for which the defendant bears the burden of proof." *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 20 (2d Dist.). "In order for a defendant to establish self-defense involving the use of nondeadly force, he must prove by a preponderance of the evidence (1) that the defendant was not at fault in creating the situation giving rise to the altercation and (2) that he had reasonable grounds to believe and an honest belief, even though mistaken, that he was in imminent danger of bodily harm and his only means to protect himself from such danger was by the use of force not likely to cause death or great bodily harm." (Footnote and citations omitted.) *Id.*

*State v. Malott,* 2d Dist. Montgomery No. 26420, 2015-Ohio-2968, ¶ 14.

{¶ 20} Having thoroughly reviewed the entire record, we cannot conclude that the trial court lost its way such that Allison is entitled to a new trial. We conclude the trial court's decision to reject Allison's self-defense claim was not against the manifest weight of the evidence. We note that Hoskin testified that she phoned Allison to ask him for a

ride home, and she and Allison testified that she got into his car upon his arrival. Allison then left his vehicle to approach Hoskin's vehicle. While Allison testified that Williams then exited the vehicle and approached him in an aggressive manner, the evidence reflects that the first physical contact between the two men was initiated by Allison. According to Allison, Williams "came at me. * * * I threw him on his back and that's when he bit me." There was no evidence adduced of any other injury sustained by Allison. When asked if he hit Williams first, Allison responded, "I don't think there was a punch. I threw him on the ground." Allison further testified that he "grabbed" Williams and "slammed him on the ground," and that he "threw him to the ground first."

{¶ 21} Thompson's and Smith's testimonies were consistent with Williams' that Allison was the primary aggressor. While Hoskin testified that Williams "jumped out at" Williams "like a ninja," she acknowledged that she informed the responding police officers that she "didn't see who threw the first hit." Williams testified that his jaw, cheek and "rib cage" were injured as a result of the assault. For the foregoing reasons, we conclude that the exceptional circumstances necessary to find a conviction against the manifest weight of the evidence are absent from the record before us. Accordingly, Allison's sole assigned error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . .

FAIN, J. and FROELICH, J., concur.

Copies mailed to:

Ryan Brunk
Michael A. Partlow
Hon. James D. Piergies