[Cite as *State v. Henderson*, 2021-Ohio-3943.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28975 |
| | : | |
| v. | : | Trial Court Case No. 2020-CRB-1522 |
| | : | |
| CHRISTY A. HENDERSON | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

# O P I N I O N

Rendered on the 5th day of November, 2021.

. . . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101 & ANDREW D. SEXTON, Atty. Reg. No. 0070892, City of Dayton Prosecutor's Office, 335 West Third Street, Room 390, Dayton, Ohio 45402
  Attorneys for Plaintiff-Appellee

DAWN S. GARRETT, Atty. Reg. No. 0055565, 70 Birch Alley, Suite 240-24005, Beavercreek, Ohio 45440
  Attorney for Defendant-Appellant

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Defendant-Appellant Christy A. Henderson was found guilty by a jury of misdemeanor assault in violation of R.C. 2903.13. The trial court sentenced her to 180 days in jail with 60 days stayed and credit for time served. On appeal, Henderson argues that the verdict was based upon insufficient evidence and was against the manifest weight of the evidence. She also asserts that she was denied her constitutional right to effective assistance of counsel. For the reasons that follow, the trial court's judgment will be affirmed.

I.        **Facts and Procedural History**

{¶ 2} According to hospital records, emergency medical personnel were dispatched to Henderson's home on the morning of May 17, 2020, after her boyfriend found her lying in bed, foaming at the mouth, and experiencing "seizure-like activity." Upon arrival, the emergency medical personnel reported that Henderson was extremely combative, and she was sedated to safely transport her to the hospital for treatment.

{¶ 3} Once Henderson "came-to" in the emergency department, doctors and nurses reported that the combative, non-compliant behavior that she demonstrated with the EMS team returned. She was unable to provide an adequate history, refused to answer questions, and yelled at the staff.

{¶ 4} Eventually, Henderson was admitted to the advanced neurological unit at Miami Valley Hospital with plans (from the doctors at least) to undergo an MRI and EEG to further determine if she had indeed suffered from a seizure and if there were other pressing medical concerns. Immediately upon arriving on the advanced neurological unit, the nursing staff noticed that Henderson was argumentative, difficult to redirect, and

refused all care, including a cardiac monitor. The pattern of confrontational behavior continued, and a "sitter" was placed in the room for the safety of the patient and staff.

{¶ 5} Mona Woods, a patient care technician on the advanced neurological unit, was assigned the task. Woods testified that she was informed that the doctor was taking precautions because Henderson possibly suffered a seizure and was therefore a fall risk. Woods' job was to sit in Henderson's room, keep a close eye on her, and chart her activities. Woods entered Henderson's room at approximately 7:15 p.m., introduced herself, and explained what she would be doing.

{¶ 6} According to the record, having Woods in the room was problematic for Henderson. Woods testified that Henderson immediately began making fun of her youth (Woods was 26 at the time) and made the comment: "You're a kid. Go over there and watch cartoons." Henderson also became upset that she was not permitted to order Door Dash (due to COVID restrictions), as she did not want the food that hospital staff had given her. As her assignment required, Woods charted everything she saw happen in the room. Her entry at 7:42 p.m., less than a half hour into her shift, captured the tension in room:

> Patient started yelling. She doesn't want her tray. She will order Door Dash. Nurse stated we can't go downstairs. And [Henderson] started yelling. Patient started recording entire room with me in it and said she will post on Facebook and YouTube that she is being mistreated. She is on the phone talking to family member saying that the staff talked to her when she wasn't with it. Patient also said she will get a lawyer involved and that they are being racist and sent a colored girl to sit will make it better [sic]. Patient

recorded on her phone that we haven't given her anything to eat or drink,

but she refused her two trays.

Trial Tr. at 80. Woods later testified that Henderson did indeed make at least one Facebook Live post and did call a lawyer. Woods also testified that, despite being on the receiving end of hostilities, she remained calm and tried to ignore it the best she could.

{¶ 7} A couple of hours into Woods' watch, Henderson decided that she wanted to take a shower. Woods was unsure if the doctor had given her a "shower order," so positioning herself halfway in and halfway out of the doorway, she poked her head out to ask the nearby doctor and nurses if Henderson could shower. While Woods was doing this, Henderson became even more agitated, demanding to take a shower immediately. The doctor and nurse soon confirmed that Henderson did not have the requisite order and could not shower. Woods relayed the message and informed Henderson that, while she was not permitted to shower, she could have a "bed bath" or wash up at the sink.

{¶ 8} Not satisfied with this answer, Henderson turned on the shower anyway. Woods testified that she went into the bathroom, turned off the water, and explained again why a shower was off-limits, to which Henderson replied, "Bitch, I'll do whatever I want to do. You can't tell me what to do." Trial Tr. at 97.

{¶ 9} Woods went back to the door to inform the nurses and doctor of the escalating situation, again positioning herself partway in and partway out of the doorway. Henderson suddenly slammed the door shut, forcing Woods to jump out into the hallway to avoid injury. Woods immediately tried to push her way back into the room, but before she could open the door completely, it flew back open, and Henderson charged, yelling "Bitch, I'll hit you." Woods testified that the next thing she knew, Henderson grabbed her

by the hair and neck, and punched her in the face multiple times. She also recalled that Henderson kicked her.

{¶ 10} The floor staff immediately rushed over and pulled Henderson off of Woods. After giving hospital police a statement, Woods was taken to the emergency department for treatment and was soon released. While no serious injuries were reported, she experienced swelling and bruising around her eye and persistent headaches which left her unable to work for more than a month. Henderson, who was unharmed, was arrested and taken to jail.

{¶ 11} On May 19, 2020, Henderson was charged with one count of assault, a misdemeanor of the first degree. The case proceeded to trial on October 21, 2020, during which the jury heard testimony from Woods, hospital staff on duty when the incident occurred, and Henderson. After a short deliberation, Henderson was found guilty and sentenced to 180 days in jail with 60 days stayed and credit for time served. She was also placed on two years of supervised probation.

{¶ 12} Henderson has filed a timely appeal.

## II.    The evidence supported conviction

{¶ 13} In her first assignment of error, Henderson argues that the verdict was based upon insufficient evidence and was against the manifest weight of the evidence.

{¶ 14} A sufficiency of the evidence argument disputes whether the prosecution has presented adequate evidence on each element of the offense to permit the case to go to the jury or to sustain the verdict as a matter of law. *State v. Brock,* 2019-Ohio-3116, 140 N.E.3d 1239, ¶ 16 (2d Dist.). Our role when reviewing the sufficiency of the evidence to support a conviction is to "examine the evidence admitted at trial to determine whether

such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 15} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except "in the exceptional case in which the evidence weighs *heavily* against the conviction." (Emphasis added.) *Id.* "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 10th Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 25.

{¶ 16} It is well established that, when conflicting evidence is presented, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed one party's testimony over the other. We "will not substitute [our] judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 16.

{¶ 17} In the case before us, Henderson was charged with violating R.C. 2903.13(A), which provides that "[n]o person shall knowingly cause or attempt to cause

physical harm to another or to another's unborn." The evidence presented at trial left no doubt that the conviction was supported by the evidence.

{¶ 18} The jury first heard testimony from Woods. She testified that after telling Henderson that she could not take a shower, Henderson slammed the door on her and then charged, yelling "Bitch, I'll hit you." Woods described that Henderson grabbed her by the hair and punched her. She also recounted being kicked by Henderson. Further, Woods told the jury that she suffered from swelling and bruising around her eye and chronic headaches. The jury saw pictures confirming the injury.

{¶ 19} The testimony of other staff members corroborated Woods's account. Dr. Samuel Theis, the covering physician on the neurological unit that night, testified that he watched as Woods backed out of the room and then observed Henderson come out and attack her. Dr. Theis stated that he ran over and physically removed Henderson from Woods and then escorted her back to her room and waited for security to arrive.

{¶ 20} Javonne Baker, another patient care technician on the floor, gave the jury a similar account. Baker testified that around 12 or 12:30 a.m., she heard yelling and ran down to Henderson's room to find her "grabbing [Woods] by her hair and swinging at her and kicking her." Trial Tr. at 224. Baker further told the jury that "[Woods] was just holding her hands up. That was all she was doing and trying to get away." Trial Tr. at 225.

{¶ 21} Courtni Gustin, a registered nurse on the floor, testified that "[t]he patient was coming toward Ms. Woods. * * * And [Henderson] was screaming, yelling at her. She had [Woods] pinned * * * [a]nd she grabbed [Woods] by the hair * * * and twisted her hair underneath and started hitting [Woods]." Trial Tr. at 253.

{¶ 22} Finally, nurse and team lead Kristi Pence testified that around midnight she

heard the door slam and heard Woods say, "She's going to hit me." Pence then recounted that she ran over to Henderson's room and when she arrived, there was a mass of people trying to pry Henderson off Woods. Pence stated that she attempted to get Henderson's fingers out of Woods's hair.

{¶ 23} While Henderson herself testified that she swung at Woods, her main point of contention was that she acted in self-defense because she was held at the hospital against her will.

{¶ 24} Self-defense is an affirmative defense; it is a "justification for admitted conduct * * * [that] represent[s] not a mere denial or contradiction of the evidence, [but] * * * is a substantive or independent matter which the defendant claims exempts [her] from liability even if it is conceded that the facts claimed by the prosecution are true." *State v. Poole*, 33 Ohio St.2d 19, 294 N.E.2d 888 (1973). Stated differently, self-defense seeks to relieve a defendant's culpability rather than negate an element of the offense.

{¶ 25} To justify the use of less-than-deadly force in self-defense, a defendant must introduce evidence showing that: (1) she was not at fault in creating the violent situation; (2) she had a bona fide belief that she was in imminent danger of bodily harm; and (3) the only means to protect herself from danger was the use of force not likely to cause death or great bodily harm. *State v. Bennett,* 2019-Ohio-2996, 140 N.E.3d 1145, ¶ 14 (2d Dist.), citing *State v. Allison*, 2d Dist. Montgomery No. 26885, 2016-Ohio-5262, ¶ 19. Additionally, R.C. 2901.05(B)(1) mandates that there must be evidence presented that supports the conclusion that the accused used the force in self-defense. If a defendant meets that burden, "the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense[.]" R.C. 2901.05(B)(1).

{¶ 26} In this case, Henderson fails to directly address any of the self-defense factors but seems to stake her claim on the insinuation that she was being held against her will by Miami Valley Hospital. While she did testify that she felt strong enough to walk home, and the record does include some indication that Henderson expressed a desire at one point to be discharged, the totality of the evidence presented at trial painted a much different picture.

{¶ 27} In addition to the physician narratives in Henderson's medical records, the jury heard testimony from Dr. Theis and Nurse Pence that if Henderson wanted to leave the hospital, it was only on her terms. Dr. Theis testified that various times during her stay, he talked with Henderson about her options and concerns. One of the things they talked about, according to the doctor, was that Henderson could leave at any time. "The patient is not a captive in our hospital." Trial Tr. at 146. He explained to the jury that Henderson did not have a capacity holder that would force her to stay, and she was not restrained in any way.

{¶ 28} According to the record, Henderson, at times, wanted to leave the hospital, but she wanted to be discharged on *her* terms. Dr. Theis testified that Henderson wanted to be medically discharged, but that was not an option he was comfortable with because she had refused to undergo any medical tests to identify what caused the "seizure-like activity" that brought her to the hospital in the first place. "I believe she stated * * * she wasn't going to leave the hospital unless I medically discharged her," Dr. Theis testified. "She refused to sign anything for us." Trial Tr. at 155.

{¶ 29} Nurse Pence testified that she learned from the day shift nurses that Henderson vacillated between wanting to leave against medical advice and not. In fact,

Pence testified that when she arrived for her shift, hospital police were ready to give Henderson a ride home, but she refused to leave against medical advice. Pence also told the jury that she discussed options with Henderson and told her that "no one is keeping you here." Henderson refused to leave without being medically discharged, something that medical personnel would not agree to without testing and treatment.

{¶ 30} Woods also testified that she heard Henderson tell Dr. Theis that she wanted to leave, but only if the doctor would medically discharge her. When the doctor told her that she could leave against medical advice, Henderson stated that she "will live here and get three meals a day." Trial Tr. at 88.

{¶ 31} The record indicates that Henderson was not held against her will by the hospital. To the contrary, she voluntarily stayed because Dr. Theis would not discharge her on *her* terms. Therefore, her claim that the hospital held her against her will lacks merit.

{¶ 32} In a similar vein, Henderson posits that Woods was keeping her trapped in her room by blocking the exit. Consequently, Henderson told the jury that she moved Woods out of the way by grabbing her hair, causing a fight to break out. Henderson's version of the events was in stark contrast with the accounts of every other witness, including Woods, who experienced the situation firsthand. But even if we were to accept Henderson's version of the incident as true, she would still have been required to demonstrate that she had a bona fide belief that she was in imminent danger of bodily harm and the only means to protect herself was the use of force. *Bennett,* 2019-Ohio-2996, 140 N.E.3d 1145, ¶ 14. There was nothing in the record that demonstrated Henderson was threatened with harm or that she was afraid she would be injured by

anyone in the advanced neurological unit of the hospital. Likewise, there was no evidence that she had to fight with Woods to escape from supposed danger. This claim lacks merit as well.

{¶ 33} There is one more fatal flaw with Henderson's self-defense claim: her counsel explicitly declined to pursue a self-defense instruction at trial. As we have stated in the past, a defendant waives a self-defense claim on appeal if it is not raised before the trial court. *Id.* at ¶ 18.

{¶ 34} Based on the testimony and exhibits offered at trial, the State presented adequate evidence on each element of the offense to permit the case to go to the jury and to sustain the verdict as a matter of law; there was sufficient evidence to support the conviction. Similarly, this was not a case where the jury clearly lost its way and created a miscarriage of justice; the conviction was not against the manifest weight of the evidence. The first assignment of error is overruled.

### III. Ineffective Assistance of Counsel

{¶ 35} In her second assignment of error, Henderson asserts that her constitutional right to effective assistance of counsel was violated when trial counsel chose not to seek a self-defense instruction.

{¶ 36} To prevail on an ineffective assistance of counsel claim, a defendant must prove that his or her attorney was ineffective under the standard test from *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The test has two parts. First, the defendant must show that counsel's performance was deficient. *Id.* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second,

the defendant must show that the deficient performance prejudiced the defense." *Id.*

{¶ 37} As to the first prong, much deference is given to trial counsel. "[A] court must indulge in a strong presumption that the challenged action might be considered sound trial strategy. Thus, judicial scrutiny of counsel's performance must be highly deferential." *State v. Bird*, 81 Ohio St.3d 582, 585, 692 N.E. 2d 1013 (1998).

{¶ 38} If the first prong is met, then "prejudice" may be considered. To demonstrate prejudice, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1998), first paragraph of the syllabus.

{¶ 39} A failure to meet either prong defeats the claim.

{¶ 40} Based on the evidence presented at trial, we determined in the previous assignment of error that Henderson could not have made a successful self-defense claim, even if it had been raised below. Consequently, her trial counsel was not ineffective for failing to raise the claim. The second assignment of error is overruled.

## IV. Conclusion

{¶ 41} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and WELBAUM, J., concur.

Copies sent to:

Stephanie L. Cook
Andrew D. Sexton
Dawn S. Garrett
Hon. Christopher D. Roberts