[Cite as *State v. Southern*, 2018-Ohio-4886.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27932 |
| | : | |
| v. | : | Trial Court Case No. 2017-CRB-1478 |
| | : | |
| GARY SOUTHERN | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of December, 2018.

. . . . . . . . . . .

GARRETT P. BAKER, Atty. Reg. No. 0093662, City of Dayton Prosecutor's Office, 335 West Third Street, Room 372, Dayton, Ohio 45402
     Attorney for Plaintiff-Appellee

STEVEN H. ECKSTEIN, Atty. Reg. No. 0037253, 1208 Bramble Avenue, Washington Court House, Ohio 43160
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Gary Southern appeals a final judgment of the Dayton Municipal Court, which found him guilty on four counts of knowingly committing an act of cruelty against a companion animal and sentenced him to a suspended jail sentence, with certain collateral restrictions.   The judgment of the trial court will be affirmed.

### Factual Background and Procedural History

{¶ 2} On March 10, 2017, the State of Ohio filed 16 criminal complaints charging Southern with five first-degree misdemeanor counts of knowingly committing an act of cruelty against a companion animal, in violation of R.C. 959.131(B); five second-degree misdemeanor counts of negligently committing an act of cruelty against a companion animal, in violation of R.C. 959.131(D)(1); five second-degree misdemeanor counts of depriving a companion animal of or confining a companion animal without necessary food or sustenance, in violation of R.C. 959.131(D)(2); and one second-degree misdemeanor count of cruelty to animals, in violation of R.C. 959.13(A)(1). The charges related to four adult Brittany Spaniels – Laffy, Sassie, Sallie, and Polly – and a dead turtle, all found on Southern's property. Southern entered pleas of not guilty to all 16 charges.

{¶ 3} During Southern's jury trial, the State presented as witnesses two animal care and control officers ("ACOs") with the Montgomery County Animal Resource Center ("ARC"), as well as Montgomery County's chief dog warden, Mark Kumpf, and two veterinarians, Dr. Kelly Meyer and Dr. Marion Walter Belue.

{¶ 4} ACO Torbin Peterson testified that he was dispatched to Southern's address on January 21, 2017, to investigate a complaint of a "thin" dog. On arrival, ACO Peterson

saw a house that appeared to be unoccupied, with a male dog tied to a trailer[1] in the driveway and three more dogs confined to the backyard.[2] One dog in the backyard was loose in a makeshift pen and two others were "chained to something, I couldn't tell what." ACO Peterson testified that, based on his training, the dogs "looked to be about ten to fifteen pounds underweight"; "I could see their ribcages and I could see their hip bones." Two empty bowls were present, but none of the dogs had food or water. ACO Peterson also had safety concerns based on the condition of the property, which he described as strewn with debris on which a dog "could cut its foot or injure itself." Unable to contact Southern, ACO Peterson spent only six to ten minutes at the property, posting "a warning for no license" and planning to arrange a follow-up visit.

{¶ 5} ACO Jessica France testified that she was dispatched to Southern's address on February 1, 2017, to follow up on the concerns reported earlier. Because the house seemed to be uninhabited, she knocked on the side of the adjacent trailer. ACO France then saw a barking dog chained next to the trailer, from which Southern emerged. He and ACO France walked toward the backyard, where ACO France saw two more dogs. One of those dogs also was "chained up," and the other was loose behind fencing.

{¶ 6} All three dogs were adult Brittany Spaniels, which ACO France described as "dirty" and "severely underweight." She said that their hip bones and ribs were visible, meaning that they "d[id]n't have healthy muscle mass." Based on her training, she judged the dogs to be "a four" on a scale commonly used to assess a dog's physical condition,

---

[1] A later witness described the trailer as "the type you would pull behind a pick-up truck." (Tr. Vol. 1, p. 245.)

[2] ACO Peterson initially mentioned two dogs in the backyard, but later referred to three dogs located there, for a total of four dogs. (*See* Tr. Vol. 1, pp. 122, 123, 134.)

with "five being extremely emaciated." ACO France also was concerned about the state of the property, as there was "various debris all over the yard" that dogs could eat or in which they could become entangled. The dogs had no water and no "quality" shelter. For example, one dog's available shelter was a cap designed for the back of a pickup truck, inside which the dog could not stand up. Additionally, none of the dogs had bedding, forcing them to lie on the cold ground "shivering," with a risk of developing pressure sores.

{¶ 7} While ACO France did not see Southern's fourth adult dog on that visit, Southern did walk out with a box of that dog's puppies, "but he did not allow me to see them." Southern told her that there were six puppies.

{¶ 8} ACO France testified that Southern was "argumentative" when she shared her concerns about the adult dogs' conditions; "[h]e stated that beauty is in the eye of the beholder." Told that the dogs were underweight, Southern said that Laffy (the male Brittany Spaniel) "was recovering from parvo," a canine virus, but he provided no medical documentation to support that claim. He told ACO France that the dogs had not been seen by a veterinarian "in over a year." Southern also told France that he was feeding each dog "a coffee cup" of Pedigree dry food each day. ACO France testified that quantity would be insufficient for dogs the size of Brittany Spaniels. France identified various photographs she took on that date, including some depicting the condition of the dogs and the "debris" amidst which they were living, which were admitted into evidence and shown to the jury.

{¶ 9} On February 8, 2017, ACO France did a follow-up visit to Southern's residence. The condition of the property was unchanged, and three dogs still were tied outside with no food, no bedding, and only minimal, dirty water. Sassie, the mother dog,

was inside the house, with her head sticking out of the basement window. Southern said that he had not taken the dogs to a veterinarian due to lack of transportation, but that he had increased their food to two cups per day. However, France noticed no change in the dogs' weight. She gave Southern the telephone number of Dr. Belue, who has a "mobile vet clinic" able to come to Southern's home to treat the dogs. She told Southern that she would return in a week to check on the dogs' progress.

{¶ 10} On February 14, 2017, ACO France contacted Dr. Belue, who said he had not seen Southern's dogs. France then reported to her supervisor her concerns about the dogs' well-being given their low weight and the cold weather.

{¶ 11} On February 16, 2017, a search warrant was executed on Southern's property by ARC's director, an ARC supervisor, two Dayton police officers, and ACO France. France described that day's temperature as 40 degrees, Southern's property as still cluttered with trash and debris, and each dog as "emaciated" – "almost a walking skeleton." In order to minimize the stress on the dogs, Southern agreed to bring all of them out to the ARC van, into which they were loaded.

{¶ 12} The ARC representatives then went into the house on Southern's property. ACO France testified that the house had no running water, no electricity, and no heat. Throughout the house, but especially in the basement, "[t]he floors were covered in feces," trash, debris, dirt, and urine. She stated that such conditions are unsafe for dogs.

{¶ 13} Inside the trailer was a small bag of off-brand dog food that "can be bought at dollar stores," with a soup can presumably used to dispense the food. No veterinary records were found, but there were documents related to breeding and selling puppies. Four puppies were recovered from the site; Southern said that the other two had died and

were buried elsewhere. On the first floor of the house, officers also found a dead box turtle inside a crate without water, food, or heat lamps. ACO France again identified photographs depicting the dogs, their living conditions, and the general condition of the property as found on that date. She testified that all four adult dogs – Laffy, Sassie, Polly, and Sallie – were underweight with protruding hip bones and ribs.

{¶ 14} Asked on cross-examination if Brittany Spaniels are hunting dogs, ACO France said that the breed can be used to hunt, but "[t]here was no mention that these were hunting dogs." On re-direct, she testified that hunting dogs would need "healthy, lean muscle mass" in order to withstand the rigors of hunting and typically would be adequately fed.

{¶ 15} ARC director and chief dog warden Kumpf testified about his role on February 16, 2017. Kumpf said that Southern's property was "dilapidated," with "a lot of junk, trash, and debris piled up in and around the residence." He described the four adult dogs found there as being "pretty much one step away from walking skeletons;" they "were clearly underweight, to the point that you could see their ribs, their hip bones * * *. [I]t was clear that they were missing a great deal of body mass, appearing very[,] very under weight" [sic]. Given the cold temperatures, the dogs' low weight, and their lack of bedding, Kumpf was concerned that they were in danger of freezing to death.

{¶ 16} Kumpf also testified that feces found throughout the scene "can harbor disease," and that puppies are particularly vulnerable to parvo enteritis, a communicable disease that one of the adult dogs was purported to have had. Both parvovirus and heartworm can be spread through feces, he said. According to Kumpf, because these dogs were underfed, they were eating dirt and feces. The water available to them also

was "contaminated" with dirt.

{¶ 17} Kumpf testified that the appearance of the four adult dogs in the photographs presented into evidence was "deceptive" due to the masking effect of their fur. "[T]hey don't really show that it's just fur over bones. There is no muscle mass. There is no fat. There is no deposit on top of it. It's like massaging a fur[-]covered skeleton." He further testified that hunting dogs would have even greater nutritional needs than other dogs due to their active lifestyle. Kumpf said that Southern argued that the dogs were fine, and that the dead turtle was just "hibernating," although he couldn't remember when he last had given it food or water.

{¶ 18} Dr. Kelly Meyer, an ARC veterinarian, testified as an expert witness for the State. She said that she performed intake examinations on February 16, 2016, of the four adult Brittany Spaniels and the turtle taken from Southern's property. The turtle was "significantly decomposed," making it "impossible" to determine how the turtle died or how long it had been dead.

{¶ 19} Meyer testified that Laffy, the male dog, was almost 10 pounds underweight and had a score of four on the canine assessment scale, "meaning that Laffy was extremely emaciated." "I could feel each and every rib. I could feel the hip bones. I could feel the bones in the head." Laffy's coat was "extremely dirty," foul smelling, and "covered in urine and feces," and his nails were "extremely long," causing "a quite painful condition" easily remedied by trimming the nails.

{¶ 20} As to the female dogs, Meyer testified that two (Sassie and Polly) also had canine assessment scores of four, with the third (Sallie) being "slightly better in body condition but [ ] only [an assessment score of] three, which is still emaciated." All also had

poor coat condition and bad odor, and Sassie and Sallie also had overly long nails. Meyer further testified that all ate "aggressively" when first fed, "as if they had had not seen food in a very long time," and that Polly in particular also drank "aggressively." "It was clear that these dogs had not been fed enough and a couple of them had not received adequate water either." According to Meyer, all four of the dogs "gained approximately eight pounds in seven days" – about 20 percent of their body weight – "with doing nothing but just feeding them" regularly. She opined that dogs in such a state of starvation and emaciation would be in a "constant state of hunger," and "to me, that constitutes suffering."

{¶ 21} In addition, Meyer testified that both Polly and Sassie, the mother dog, tested positive for heartworms, a parasite that can damage the heart and is potentially fatal. Although heartworm is "quite easily prevented" with a monthly pill, treatment once heartworm has been contracted "is very dangerous for a dog that is extremely underweight." Meyer's other "major concern" for Sassie was that her low body weight meant that she "d[id]n't have enough muscle mass and body fat to sustain adequate nutrition for her or her puppies." Meyer testified that Sassie "was clearly not receiving adequate nutrition," "was clearly not receiving [ ] adequate heartworm prevention," and was "in significant danger because of being strong positive [for heartworm] and being a n[ur]sing mom with very low body weight."

{¶ 22} According to Meyer, Polly "actually was in the worst condition" of the four dogs. She had the lowest weight and, in addition to being a "strong positive" for heartworm, she also tested positive for both whipworms and hookworms, parasites that can be spread through feces and are common in dogs "living in an unsanitary environment."

{¶ 23} Opining that all four dogs were so underweight it was "open and obvious" to anyone that they "need[ed] help," Meyer testified that she considered their condition to constitute "severe neglect to the point of being intentional."

{¶ 24} Dr. Belue, a veterinarian who operates his own mobile small animal practice, testified that someone he believed to be Southern telephoned Belue twice in February 2017, concerning "a challenge" from the county about the health and weight of his dogs. Although the caller seemed to listen to Belue's advice about the importance of having medical records, Southern never made an appointment or obtained any services from Belue. On cross-examination, Belue admitted that people can obtain worming medications over the counter, "but they take a risk" that such medications may not work and may not be the right medication, some of which are obtainable only from veterinarians. Asked whether Brittany Spaniels are "a working breed," Belue responded that most Brittany Spaniels "are just pets. [Owners] don't go out and hunt with them and train them to hunt and do the things that they were specifically bred for. * * * All the ones I see are pets."

{¶ 25} At the end of the State's case, Southern's defense counsel moved pursuant to Crim.R. 29 to dismiss all charges regarding the dead turtle, but then withdrew that motion. (*See* Tr. Vol. 2, pp. 370-373.) Southern thereafter elected not to testify, and the defense presented no other witnesses. Defense counsel then renewed his Crim.R. 29 motion to dismiss the counts related to the dead turtle. (*Id.* at pp. 375-376.) The trial court granted that motion and dismissed the animal cruelty charge under R.C. 959.13(A)(1) and one of each of the companion animal charges under R.C. 959.131(B), R.C. 959.131(D)(1), and R.C. 959.131(D)(2). (*Id.* at pp. 376-379.)

**{¶ 26}** After deliberating over the remaining charges, the jury returned verdicts of guilty as to all 12 counts. The trial court granted the subsequent motion of Southern's trial counsel to withdraw due to the breakdown of the attorney-client relationship, and new counsel appeared on Southern's behalf.

**{¶ 27}** At sentencing, the trial court merged the offenses under R.C. 959.131(D)(1), R.C. 959.131(D)(2), and R.C. 959.13(A)(1) with the four offenses under R.C. 959.131(B), one as to each dog. On November 14, 2017, the trial court sentenced Southern to 180 days in jail and $100 in fines as to each offense under R.C. 959.131(B), with all time and all fines suspended, plus five years of non-reporting community control, subject to the additional provisions that Southern "is prohibited from own[ing], possess[ing], harbor[ing], maintain[ing], or hav[ing] care [or] custody of any animal," and that he "allow Animal Resources to inspect[ his] property for animals."

**{¶ 28}** Southern appeals from that conviction, raising three assignments of error:

1) Trial counsel rendered ineffective assistance during trial in violation of Southern's rights under the Fifth, Sixth[,] and Fourteenth Amendments to the United States Constitution, and Sections 10 and 16, Article I of the Ohio Constitution.

2) The trial court erred in accepting the jury verdict of guilty as the evidence presented was insufficient to conclude that guilt had been proven beyond a reasonable doubt in violation of Southern's rights to due process and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution.

3) The trial court erred in entering a finding of guilty because such verdict was against the manifest weight of the evidence, Fifth and Fourteenth Amendments, United States Constitution, and Article I, Section16 of the Ohio Constitution.

### Law Applicable to Animal Cruelty Offenses

{¶ 29} The statute governing cruelty against companion animals provides in pertinent part as follows:

(B) No person shall knowingly torture, torment, needlessly mutilate or maim, cruelly beat, poison, needlessly kill, or commit an act of cruelty against a companion animal.

R.C. 959.131.

{¶ 30} That statute defines "companion animal" as "any animal that is kept inside a residential dwelling and any dog or cat regardless of where it is kept." R.C. 959.131(A)(1). However, R.C. 959.131 does not apply to "[d]ogs being used or intended for use for hunting or field trial purposes, provided that the dogs are being treated in accordance with usual and commonly accepted practices for the care of hunting dogs." R.C. 959.131(G)(3).

{¶ 31} For purposes of R.C. 959.131, "[c]ruelty," "torture," and "torment" mean "every act, omission, or neglect by which unnecessary or unjustifiable pain or suffering is caused, permitted, or allowed to continue, when there is a reasonable remedy or relief." R.C. 1717.01(B); *see* R.C. 959.131(A)(2). That definition "is broad enough to include situations where an animal suffers needlessly because of the owner's failure to seek critically necessary veterinary care, if such care represents a reasonable remedy." *State*

*v. Dresbach*, 122 Ohio App.3d 647, 651, 702 N.E.2d 513 (10th Dist. 1997). Failure to seek timely treatment for a dog's internal parasite infestation is one example that, if proven, would sustain a cruelty to animals conviction. *Id.*

**{¶ 32}** Evidence that a defendant knowingly failed to provide a companion animal with adequate food or water also will support a conviction for violating R.C. 959.131(B). *See State v. Farmer*, 12th Dist. Butler No. CA2013-06-097, 2014-Ohio-3079 (affirming cruelty conviction under R.C. 959.131(B) relative to "emaciated and dehydrated dog," finding that "starvation, dehydration, and exposure during the frigid winter months[ ] was cruel"). "[E]ven though evidence of severe malnutrition, starvation, and emaciation is extremely probative of the lack of sufficient food, * * * a lesser degree of nutritional deprivation may be sufficient to sustain a conviction if the animal is not receiving enough food to meet the needs of the situation." *Akron v. Donnelly*, 9th Dist. Summit No. CA 16821, 1995 WL 72335, *3 (Feb. 22, 1995).[3]

**{¶ 33}** In another animal cruelty case, the 12th District noted that:

As defined by Merriam-Webster's Online Dictionary and Thesaurus, the word "starvation" means "*suffering* or death *caused by having* nothing to eat or *not enough to eat.*" The term "starve" has also been defined as "to deprive of nourishment." *Webster's Third New International Dictionary* (1993).

(Emphasis added.) *State v. Morgan*, 2014-Ohio-2472, 14 N.E.3d 452, ¶ 54 (12th Dist.). *See also State v. Nichols*, 4th Dist. Hocking No. 017AP10, 2007-Ohio-1327, ¶ 16 (veterinarian's testimony that horses "were on the verge of starvation" and other

---

[3] There the appeal was from a conviction under R.C. 959.13(A)(1) related to underweight horses, but the rationale is relevant as to grossly underweight companion animals.

witnesses' testimony that horses were "malnourished," "emaciated," and looked "terrible" was sufficient evidence to prove crime of cruelty to animals beyond a reasonable doubt).

### *Assignment of Error #2 – Insufficient Evidence*

**{¶ 34}** In his second assignment of error, Southern contends that the evidence presented by the State was constitutionally insufficient to support a finding that Southern's dogs "were in pain or were suffering." Because our conclusion regarding that argument may affect our analysis of Southern's other two assignments of error, we will address his challenge to the sufficiency of the evidence first.

**{¶ 35}** " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6 Ed.1990). "Sufficiency" is essentially "a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

**{¶ 36}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond

a reasonable doubt." *Id.*

{¶ 37} Viewing the evidence in the State's favor, we conclude that such evidence was sufficient to allow a reasonable jury to find beyond a reasonable doubt that Southern "knowingly torture[d], torment[ed], * * * or commit[ed] an act of cruelty against" all four Brittany Spaniels, in violation of R.C. 959.131(B). Dr. Meyer testified that the "extremely long" nails she found on Laffy, Sassie, and Sallie constituted "a quite painful condition" that could have been relieved simply by trimming their nails. Her testimony thus belies Southern's characterization of long nails as merely "a cosmetic condition" and satisfies the requirement that a violation of R.C. 959.131(B) cause "unnecessary or unjustifiable pain or suffering." *See* R.C. 1717.01(B).

{¶ 38} In addition, Dr. Meyer testified that both Polly and Sassie tested positive for heartworms, a potentially fatal parasite, and that Polly also tested positive for both whipworms and hookworms. Although Dr. Meyer stated that heartworm is "not painful," a reasonable jury nonetheless could deduce that the dogs *suffered* as a result of their infestations, which Dr. Meyer indicated would cause "extreme" tiredness and an "inability to be active," and could contribute to the dogs' low weights. Those untreated parasitic infections would suffice to support findings that Southern violated R.C. 959.131(B). *See Dresbach*, 122 Ohio App.3d at 651, 702 N.E.2d 513.

{¶ 39} Furthermore, Dr. Meyer testified that all four adult dogs were "aggressively" hungry and seriously underweight, while ACO France and ARC director Kumpf described them as so emaciated that they were nearly skeletal. Although the trial court would not permit Dr. Meyer to testify regarding whether the dogs were in pain as a result of their low

weights,[4] Dr. Meyer did testify that dogs experience "suffering" as a result of being in a "constant state of hunger." Persuasive legal authority likewise recognizes that failure to adequately feed an animal causes suffering, *see Morgan*, 2014-Ohio-2472, 14 N.E.3d 452, at ¶ 54 (recognizing "starvation" to mean "suffering" caused by being "deprive[d] of nourishment"), and is "cruel." *See Farmer*, 12th Dist. Butler No. CA2013-06-097, 2014-Ohio-3079, ¶ 19. *See also Nichols*, 4th Dist. Hocking No. 017AP10, 2007-Ohio-1327, at ¶ 16 (testimony that animals were "on the verge of starvation," "malnourished," "emaciated," and looked "terrible" sufficient to prove cruelty beyond a reasonable doubt).

{¶ 40} Given the undisputed evidence that Laffy, Sassie, and Sallie all experienced pain as a result of having overgrown nails, that Polly and Sassie were afflicted with internal parasites, and that all four dogs suffered from extreme hunger and weight loss as a result of being underfed, the evidence was legally sufficient to support the jury's guilty verdicts, and the trial court did not err by entering judgment based on those verdicts. Southern's second assignment of error is overruled.

### Assignment of Error #3 – Manifest Weight of the Evidence

{¶ 41} Southern's third assignment of error maintains that the jury's guilty verdicts were against the manifest weight of the evidence, again because the State allegedly failed to prove that Southern's dogs "were in pain or were suffering."

{¶ 42} In contrast to an argument regarding the sufficiency of evidence, an argument based on the weight of the evidence "challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more

---

[4] In sustaining defense counsel's objection to that testimony, the trial court opined that "[y]ou can't just look at somebody or a dog and say you're in pain." (Tr. Vol. 1, p. 286.)

believable or persuasive." *State v. Martin*, 2d Dist. Montgomery No. 27220, 2017-Ohio-7431, ¶ 8, quoting *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When reviewing an argument challenging the weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Webber*, 2015-Ohio-2183, 35 N.E.3d 961, ¶ 8 (2d Dist.), quoting *Thompkins, 78* Ohio St.3d 380, 387, 678 N.E.2d 541.

**{¶ 43}** In effect, an appellate court that reverses a conviction based on the weight of the evidence "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Given that the jury saw and heard the witnesses at trial, however, "we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *Martin* at ¶ 8, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). "The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction." *Webber* at ¶ 8, quoting *Thompkins* at 387.

**{¶ 44}** This case does not present "the exceptional case in which evidence weighs heavily against the conviction." *See id.* After reviewing the entire record, we cannot conclude that the jury "clearly lost its way" in finding Southern guilty as charged. The verdicts illustrate that the jury found the State's witnesses to be credible and chose to credit their testimony suggesting that Laffy, Sassie, Sallie, and Polly experienced

"unnecessary or unjustifiable pain or suffering" as a consequence of Southern's willful neglect. *See* R.C. 1717.01(B). We must accept the jury's credibility determinations. *See Martin* at ¶ 8. Southern's third assignment of error therefore is overruled.

### *Assignment of Error #1 – Ineffective Assistance of Counsel*

{¶ 45} Finally, Southern also contends that he was denied the effective assistance of counsel in two respects – one, that his trial counsel failed to move for acquittal under Crim.R. 29 despite the State's failure to prove that Southern's dogs "were in pain or suffering," and two, that his trial counsel failed to present evidence to support a defense that Southern's dogs were "hunting or field trial dogs," despite alluding to that defense in his opening statement and during cross-examination. Neither contention is well taken.

{¶ 46} A two-step process applies to evaluate allegations of ineffective assistance of counsel:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*State v. Calhoun*, 86 Ohio St. 3d 279, 289-290, 714 N.E.2d 905 (1999), quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 47} The defendant or petitioner has the burden of proof on the issue of ineffective assistance of counsel, as licensed attorneys in Ohio are presumed to be

competent. *Id.* at 289, citing *Vaughn v. Maxwell*, 2 Ohio St.2d 299, 209 N.E.2d 164 (1965), and *State v. Jackson,* 64 Ohio St.2d 107, 110-111, 413 N.E.2d 819 (1980). "An appellant is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic." *State v. Conley*, 2015-Ohio-2553, 43 N.E.3d 775, ¶ 56 (2d Dist.), citing *State v. Brown,* 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). "A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy." *Id.*, citing *State v. Smith,* 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985)

### a. Failure to move for acquittal

{¶ 48} We first note that the failure to file a timely Crim.R. 29(A) motion does not waive an argument on appeal concerning the sufficiency of the evidence. *See State v. Jones*, 91 Ohio St.3d 335, 346, 744 N.E.2d 1163 (2001). Having determined above that the State presented evidence sufficient to support the jury's verdicts finding Southern guilty of all four offenses under R.C. 959.131(B), we conclude that Southern's trial counsel did not perform deficiently by failing to move for acquittal on the basis of insufficient evidence. On that issue, Southern can demonstrate neither that his trial attorney "made errors so serious" that he "was not functioning as the 'counsel' guaranteed" by the Sixth Amendment nor that Southern was prejudiced by the omission. *See Calhoun* at 289-290. His assignment of error on that basis is overruled.

### b. Failure to pursue hunting dogs defense

{¶ 49} Southern also faults his trial attorney for failing to argue that the statute does not apply to hunting dogs.[5] However, nothing in the record suggests that evidence

---

[5] Although Southern's appellate brief characterizes the statute's non-application to

existed to support such an argument in this case, let alone that Southern's counsel performed deficiently by not advancing that argument. Dr. Belue testified that although Brittany Spaniels are considered "a working breed," most are "just pets." ACO France testified that Southern never mentioned his dogs being used or intended for use as hunting dogs.

{¶ 50} Even if evidence existed that Southern's Brittany Spaniels were hunting dogs, whether from Southern or otherwise, Southern was not deprived of a fair trial by the omission of that evidence. R.C. 959.131(G)(3) provides that "[d]ogs being used or intended for use for hunting or field trial purposes" are not within the statute's prohibitions only if those dogs "are being treated in accordance with usual and commonly accepted practices for the care of hunting dogs." Both France and ARC director Kumpf testified that the heightened activity level of dogs used for hunting causes them to have even greater nutritional needs than other dogs. ACO France also confirmed that it would be "usual and common" for hunting dogs to be adequately fed. As the State presented undisputed evidence that Southern's four dogs were malnourished and thus not "being treated in accordance with usual and commonly accepted practices for the care of hunting dogs," *see id.*, we cannot say that Southern's trial counsel performed deficiently by not arguing that these were hunting dogs.

{¶ 51} Southern's assignment of error based upon the allegedly ineffective assistance provided by his trial counsel is overruled.

---

hunting dogs as an "affirmative defense," we need not decide whether that characterization is accurate, given the dearth of evidence that Southern's Brittany Spaniels in fact were "hunting dogs" and the presence of evidence that they were companion animals.

### *Conclusion*

**{¶ 52}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

DONOVAN, J. and TUCKER, J., concur.

Copies sent to:

Garrett P. Baker
Steven H. Eckstein
Hon. Deirdre E. Logan