[Cite as *State v. Latocha* , 2020-Ohio-2664.]

**IN THE COURT OF APPEALS OF OHIO**
**THIRD APPELLATE DISTRICT**
**SHELBY COUNTY**

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 17-19-22

      v.

GRAZYNA LATOCHA,               O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Sidney Municipal Court
Trial Court No. 19CRB002211

Judgment Affirmed

Date of Decision: April 27, 2020

APPEARANCES:

    *Ralph A. Bauer* for Appellant

    *Jeffrey L. Amick* for Appellee

Case No. 17-19-22

**SHAW, P.J.**

{¶1} Defendant-appellant, Grazyna Latocha ("Latocha"), brings this appeal from the October 22, 2019 judgment of the Sidney Municipal Court sentencing her to ninety days in jail, with sixty suspended, and three years of probation after Latocha was convicted in a jury trial of Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(1), a second degree misdemeanor, and Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(2), a second degree misdemeanor. On appeal Latocha contends that she received ineffective assistance of trial counsel, that the trial court erred by ordering her to forfeit all of her French Bulldogs pursuant to R.C. 959.99(E)(6)(a), and that there was insufficient evidence presented to convict her.

*Background*

{¶2} On April 26, 2019, Latocha was charged with Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(1), a second degree misdemeanor, and Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(2), a second degree misdemeanor.[1] It was alleged that while firefighters were responding to a fire at Latocha's residence they found "eighteen French Bulldogs confined in wire cages, that were stacked upon each other, in the

---

[1] The State styled the charges in the complaint as "Prohibitions concerning companion animals." The statute is also known as "Cruelty against companion animal." We will use the styling of the complaint for purposes of this appeal.

basement[.] * * * Cages were found by firefighters to be wire[-]tied shut, with no trays between the stacked [] cages, and what appeared to be a large amount of feces on the bottom of the cages." (Doc. No. 1). It was also alleged that Latocha failed to provide necessary veterinary medical sustenance to one of the French Bulldogs as it had a significant eye malady resulting in blindness in one eye. (*Id*.) Counsel was appointed for Latocha and she entered pleas of not guilty to the charges.

{¶3} Prior to trial, Latocha filed a motion to have the dogs released to her care and a hearing was held on her motion. At the hearing, evidence was presented that Latocha's home was currently unlivable as it had a tarp over parts of the roof and the electricity was not on. More importantly, testimony was presented that Latocha's home was not actually zoned to have a kennel, which was defined as four or more dogs on a single property for any reason, and Latocha far exceeded the number of dogs she could have in the city of Sidney. Considering this evidence and the charges against Latocha related to her care of the dogs, the dogs' poor living conditions, and their health issues, Latocha's motion was denied and the dogs remained in the Dog Warden's custody.

{¶4} The case proceeded to a jury trial on August 29-30, 2019. After the presentation of evidence, the jury found Latocha guilty of both charges against her. Sentencing was set for a later date.

{¶5} Following Latocha's convictions, the State filed a motion to have all seventeen of Latocha's French Bulldogs forfeited pursuant to R.C. 959.99(E)(6).[2] Latocha filed a memorandum in response arguing that forfeiture of the dogs was discretionary rather than mandatory. She claimed that in this case the dogs should be returned to her.

{¶6} On October 22, 2019, the matter proceeded to a sentencing hearing and a hearing on the State's forfeiture request. Ultimately the dogs were ordered forfeited and Latocha was sentenced to serve a ninety day jail term on each count, with sixty days suspended. The thirty day jail terms were ordered to be served concurrently. Latocha was also placed on probation, which included the condition that she not have any companion or breeding animal of any kind. A judgment entry memorializing Latocha's sentence was filed that same date. It is from this judgment that Latocha appeals, asserting the following assignments of error for our review.

**Assignment of Error No. 1**
**Appellant's trial counsel rendered ineffective assistance of counsel, in violation of her constitutional rights.**

**Assignment of Error No. 2**
**Trial Court committed an abuse of discretion in ordering Appellant to forfeit her companion dogs and have no companion or breeding dogs in the future violating her right to due process and** [it was an] **unjustified taking of her property without compensation.**

---

[2] Although eighteen French Bulldogs were removed from Latocha's home, one died the first night it was in the shelter.

**Assignment of Error No. 3**
**The guilty finding was not supported by legally sufficient evidence.**

{¶7} We elect to address the assignments of error out of the order in which they were raised.

*Third Assignment of Error*

{¶8} In Latocha's third assignment of error, she argues that there was insufficient evidence presented to convict her.

Standard of Review

{¶9} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus; *State v. Pountney*, 152 Ohio St.3d 474, 2018-Ohio-22, ¶ 19 (an appellate court's function in a sufficiency review is not to determine if the evidence *should* be believed). Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Ford*, --- Ohio St.3d ---, 2019-Ohio-4539, ¶ 317. "In deciding if the evidence was sufficient, we neither resolve evidentiary

Case No. 17-19-22

conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33, citing *State v. Williams*, 197 Ohio App.3d 505, 2011-Ohio-6267, ¶ 25 (1st Dist.); *see also State v. Berry*, 3d Dist. Defiance No. 4-12-03, 2013-Ohio-2380, ¶ 19, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("Sufficiency of the evidence is a test of adequacy rather than credibility or weight of the evidence.").

Analysis

{¶10} In this case Latocha was convicted of one count of Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(1), and one count of Prohibitions Concerning Companion Animals in violation of R.C. 959.131(D)(2). The requisite statutory provisions read as follows.

> **(D) No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following:**
>
> **(1) Torture, torment, or commit an act of cruelty against the companion animal;**
>
> **(2) Deprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement[.]**

{¶11} In order to convict Latocha at trial, the State presented testimony that members of the Sidney Fire Department responded to a fire at Latocha's residence

-6-

on the night of March 26, 2019. Latocha lived in a "very large old house, three stories," and the "whole roof [was] fully engulfed" in flames. (Tr. at 94-95).

{¶12} One of the individuals who responded to the scene was firefighter/paramedic Chance Guisinger who overheard Latocha state that there were no people or pets in the house. Despite Latocha's statement, it was protocol for the fire department to conduct a search of the residence, so a team of three firefighters went inside wearing full "turnout" gear, which consisted of a coat, jacket, a hood, helmet, mask, and a breathing apparatus. Testimony indicated that because the fire was primarily on the roof at that point, there was little-to-no smoke on the first floor. Nothing of note was found on the first floor.

{¶13} The three firefighters then made their way into the basement, which was a large area splitting off through multiple doorways. Although there was little-to-no smoke in the basement either, there was between six inches to a foot of water because the water being used on the roof was coming down to rest there.

{¶14} The firefighters went in different directions in the basement and nearly simultaneously they all found dogs in kennels. Firefighter Quinten Pence located a cage with four to six puppies in it, Firefighter Guisinger and Firefighter Bryan Ramge each separately located kennels with dogs in them, some of those kennels being stacked on top of others. There were empty kennels as well. The firefighters

shouted their findings to each other, and thinking that they had perhaps twenty to twenty-five dogs in the basement, they radioed for assistance in removing them.

{¶15} Regarding what he observed, Firefighter Guisinger testified that the "dog kennels [were] stacked on top of each other with dogs in them and wire-tied shut." (Tr. at 101). By stacked, Firefighter Guisinger clarified that at least "five or six" were stacked two-high, so that one kennel was on top of another. (*Id*. at 102). He testified that "normally dog kennels have a grate that you can put on underneath to catch the feces. They were not – there was no grates and it looked as though the dogs were standing just on grated wire and they would urinate or feces [sic] on top of the other dogs [below]." (*Id*.) He added that some of the dogs were alone in kennels while some were in doubles.

{¶16} Firefighter Guisinger indicated that the kennels were wired shut so tightly that he had to cut multiple times with a wire cutter to get them open. He testified it looked like the dogs had been locked inside for months because there was not a regular sliding locking mechanism utilized on the kennels; rather there were wires holding the kennels shut that looped around multiple times.

{¶17} Firefighter Guisinger testified that once the cages were open the dogs were "filthy." (Tr. at 103). He testified that some of the dogs looked "malnourished but they – there was feces everywhere." (*Id*. at 103-104). He strongly emphasized that the dogs were covered in feces.

{¶18} Firefighter Guisinger testified that he could not smell the dogs while he was handling them because he was wearing a breathing apparatus but once the dogs had been moved and he took his mask off the firefighters' turnout gear smelled awful. He testified, "Some of the dogs were so gross, you didn't want to even grab them." (Tr. at 104). In addition, Firefighter Guisinger testified that some of the dogs had eye injuries and one had, "I believe it was a prolapsed uterus where the female ends were sticking out of the back of the dog." (*Id*.)

{¶19} Firefighter Ramge also saw a dog with "red tissue coming from coming from her vaginal area, and it was discharged down to her legs." (Tr. at 165). Further, he observed a dog with a bulging eye, and he saw scars on the dogs' feet that looked like they were white in color, thus appearing older. Firefighter Ramge testified he saw puppies swimming on each other's backs to stay above the water in the basement.

{¶20} After the firefighters cut the wires on the cages they moved the dogs to a detached garage. Firefighter Pence and Firefighter Ramge both noted how much feces they observed in the basement and in/around the cages. Firefighter Ramge testified that he saw some feces stuck on the top of one of the cages from the dog that was in the cage above, and he confirmed that his turnout gear smelled awful from handling the dogs.

{¶21} Shelby County Sheriff's Deputy/Dog Warden Kelli Ward responded to the scene of the fire due to the presence of the dogs. She noted that the dogs smelled like "fecal matter." (Tr. at 193). She counted eighteen French Bulldogs total—twelve were adults and six were puppies. Two of the females had visible vaginal concerns and multiple males had visible eye problems. With the assistance of another cruiser, the dogs were transported to a shelter where they were examined by a veterinarian.

{¶22} The veterinarian, Dr. Amanda Wagner, went to the shelter and examined the dogs after they arrived. Because of the fire she was initially concerned with smoke inhalation or potential fire burns. Dr. Wagner testified that she handled each dog personally. She testified that the dogs were wet and that they smelled of urine and feces such that she carried a towel to use between dogs.

{¶23} Dr. Wagner testified that while there were no critical emergencies, there were a number of issues with the dogs that needed to be addressed in the short term. She noted that two dogs had vaginal hyperplasia and one of those two was borderline for a full "vaginal prolapse," which she defined.

{¶24} Another dog had a progressive eye disease, though the eye was already dead. Dr. Wagner testified that the eye condition would have taken at least a week to get to that point, that the dog was likely experiencing pain and suffering before the eye died, and that the condition would have been readily apparent to anyone

taking care of the dog. Dr. Wagner testified that it was possible that the eye could have been saved with proper care, but at the very least proper care would have lessened or eliminated the pain. A picture of the dog and it's bulging eye was introduced into evidence. The eye is extensively protruding into a cone-shape.

{¶25} Dr. Wagner testified that of the twelve adult dogs she examined three males and three females had significant enough maladies to be noted, and that was an abnormal number of dogs with serious health issues. However, she testified that the dogs did not look malnourished. Dr. Wagner also testified that she had vaccinated a litter of puppies for Latocha a little over a month before the fire, but there is no indication she had ever dealt with the adult dogs.

{¶26} Deputy Ward testified that the cruiser used to transport the dogs to the shelter had to be extensively scrubbed because of how dirty the dogs were. She also testified that all of the dogs needed baths the morning that they were brought into the shelter. In addition, Deputy Ward noted that one of the puppies died after its first night in the shelter. Deputy Ward spoke with Latocha at the scene and Latocha said the dogs got veterinary care in Dayton but she could not recall the name of the vet.

{¶27} Latocha's counsel challenged the testimony of the firefighters on the basis that they had all written reports in the days after the incident but the reports did not mention certain things such as how dirty the dogs were or how they smelled

like feces. The firefighters all stated that they thought they were just writing reports for the fire and that they did not include that much detail. Firefighter Guisinger testified that he had been a firefighter/paramedic for nine years and had never been called to testify in a case. He indicated he would be more thorough in the future when writing his reports.

{¶28} At the conclusion of the testimony, the jury found Latocha guilty of both counts of Prohibitions Concerning Companion Animals.

{¶29} On appeal, Latocha argues that there was insufficient evidence presented to convict her. Specifically, she contends that the evidence was insufficient to support a finding that her dogs were deprived of necessary sustenance or that the dogs experienced any pain or suffering. She argues that the testimony from the witnesses indicated that the dogs were properly nourished, and the testimony of Dr. Wagner only indicated that the dog with the dead eye could have *potentially* improved with proper care.

{¶30} In analyzing the evidence, we emphasize that a dog, regardless of where it is kept, is defined as a companion animal pursuant to R.C. 959.131(A)(1). In addition, the testimony unequivocally indicated that the house was Latocha's and that the dogs were hers. Thus these elements of Latocha's convictions are readily established here.

{¶31} As to Latocha's conviction regarding R.C. 959.131(D)(1), the State had to show that Latocha either tortured, tormented, or committed an act of cruelty against a companion animal. "For purposes of R.C. 959.131, '[c]ruelty,' 'torture,' and 'torment' mean 'every act, omission, or neglect by which unnecessary or unjustifiable pain or suffering is caused, permitted, or allowed to continue, when there is a reasonable remedy or relief.' " *State v. Southern*, 2d Dist. Montgomery No. 27932, 2018-Ohio-4886, ¶ 31, quoting R.C. 1717.01(B); R.C. 959.131(A)(2). That definition " 'is broad enough to include situations where an animal suffers needlessly because of the owner's failure to seek critically necessary veterinary care, if such care represents a reasonable remedy.' " *Id.* quoting *State v. Dresbach*, 122 Ohio App.3d 647, 651 (10th Dist. 1997). Failure to seek timely treatment for a dog's internal parasite infestation is one example that, if proven, would sustain a cruelty to animals conviction. *Id.*

{¶32} The testimony here indicated that some of the French Bulldogs were in the bottom of stacked cages with urine and feces falling on them from dogs who were in the stacked cage above. Further, the testimony indicated that the top cages had no bottom so in addition to defecating on the dogs below, the dogs on top also stood and laid on the wire.

{¶33} Moreover, according to Dr. Wagner, *half* of the adult dogs had notable maladies, some of them visibly distressing that would have been readily apparent to

anyone handling the dogs. In addition, the dogs' cages were tied so tightly that it took multiple cuts from wire cutters to remove them. Any and all of these instances could constitute unjustifiable suffering through acts or neglect on Latocha's part. Thus sufficient evidence was presented to convict Latocha of a violation of R.C. 959.131(D)(1).

{¶34} In order to convict Latocha of a violation of R.C. 959.131(D)(2), the State had to show that Latocha "Deprive[d] the companion animal of necessary sustenance or confine[d] the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement[.]"

{¶35} The State alleged that Latocha's failure to provide veterinary care to the dog with the protruding-and-now-dead eye constituted failure to provide necessary sustenance through proper veterinary care. Latocha counters that failure to provide veterinary medical care did not constitute a failure to provide "sustenance." In addition, Latocha contends that Dr. Wagner's testimony actually supported an acquittal because Dr. Wagner only stated that the dog's eye could have *possibly* been saved with proper care.

{¶36} Latocha's argument ignores the testimony that the dog's eye injury would have been readily apparent to anyone caring for the dog, that treatment with

antibiotics could have been beneficial, and that the dog would have been suffering from pain that treatment could have alleviated had the dog received proper veterinary care. In addition, "sustenance" was defined for the jury as meaning "the supplying or being supplied with the necessaries of life." (Tr. at 338-339). The jury was able to determine for itself whether proper veterinary care should fall under the category of being supplied with the necessaries for life. Based on the testimony, when viewing it in the light most favorable to the State, we cannot find that there was insufficient evidence presented to convict Latocha of a violation of R.C. 959.131(D)(2). *See State v. Schuler*, 12th Dist. Butler No. CA2018-04-067, 2019-Ohio-1585, ¶¶ 30-35.

{¶37} Lastly, Latocha summarily argues in her brief that her convictions were against the manifest weight of the evidence without setting this issue out as its own assignment of error. In reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶38}** Nevertheless, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶39}** After reviewing the evidence in this case, we cannot find that the evidence weighs heavily against a conviction. We also cannot find that the factfinder clearly lost its way. While Latocha argues that the testimony regarding feces being in the bottom of cages was questionable, the jury was entitled to find the firefighters' testimony credible. Therefore, Latocha's third assignment of error is overruled.

*First Assignment of Error*

**{¶40}** In Latocha's first assignment of error, she argues that she received ineffective assistance of trial counsel.

Standard of Review

**{¶41}** "To establish a claim for ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that counsel's deficient performance prejudiced him." *State v. Hernandez*, 3d Dist. Defiance Nos. 4–16–

27, 28, 2017–Ohio–2797, ¶ 12, citing *State v. Phillips*, 3d Dist. Allen No. 1–15–43, 2016–Ohio–3105, ¶ 11, citing *State v. Jackson,* 107 Ohio St.3d 53, 2005–Ohio– 5981, ¶ 133, citing *Strickland v. Washington,* 466 U.S. 668, 687 (1984). The failure to make either showing defeats a claim of ineffective assistance of counsel. *State v. Bradley*, 42 Ohio St.3d 136, 143 (1989), quoting *Strickland* at 697. ("[T]here is no reason for a court deciding an ineffective assistance of counsel claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

Analysis

**{¶42}** Notably, the beginning of Latocha's "ineffective assistance" argument seems to be taken from a different brief, as it references alibi witnesses for a murder case. Nevertheless, after this detour into a seemingly different case, Latocha makes arguments that are related to the case *sub judice*, specifically contending that her trial counsel was ineffective for failing to submit any photographs showing the wire cages in which the dogs were housed. She indicates that this "clearly" would have indicated that the cages had pans in the bottoms of the cages and that they were appropriate for housing the French Bulldogs.

**{¶43}** Contrary to Latocha's argument, we do not know if the pictures exist at all as they are not included in the record. For this reason alone we could overrule Latocha's assignment of error as she cannot demonstrate error or prejudice.

-17-

{¶44} Notwithstanding this point, if Latocha is referring to photographs that were presented at an earlier hearing wherein Latocha sought to have her dogs returned prior to trial, those pictures are not dispositive in this matter as there is no indication that the cages in the pictures were those that originally housed the dogs in Latocha's basement. The pictures Latocha introduced at the hearing on having her dogs released showed cages she *hoped* to put some of the dogs in *if* they were returned to her. In fact, even in those pictures, Latocha did not have enough cages for all of the dogs.

{¶45} Furthermore, the firefighters in this case specifically testified that the cages in Latocha's residence did not have pans on the bottom and that dogs were getting covered in feces because of it. On the record before us we cannot find that Latocha demonstrated either that her counsel was ineffective or that she was prejudiced by any purported ineffectiveness. Therefore, her first assignment of error is overruled.

*Second Assignment of Error*

{¶46} In her second assignment of error, Latocha argues that the trial court abused its discretion by ordering her to forfeit her French Bulldogs and have no companion or breeding animals in the future.

Analysis

Pursuant to R.C. 959.99(E)(6)(a),

**A court may order a person who is convicted of or pleads guilty to a violation of section 959.131 of the Revised Code to forfeit to an impounding agency, as defined in section 959.132 of the Revised Code, any or all of the companion animals in that person's ownership or care. The court also may prohibit or place limitations on the person's ability to own or care for any companion animals for a specified or indefinite period of time.**

{¶47} The preceding statute clearly and unambiguously provides a trial court with authority to require a defendant convicted of a violation of R.C. 959.131 to forfeit *any or all* companion animals, and the trial court also has the authority to prohibit a person's ability to own a companion animal for an *indefinite* period of time.

{¶48} In this case the trial court heard arguments regarding forfeiture of the French Bulldogs, and ultimately ordered them to be forfeited. The trial court also ordered Latocha not to have any companion or breeding animals in the future. The trial court's decision is supported here by multiple facts: 1) the animals were found in appalling conditions; 2) when firefighters were at the scene, Latocha indicated there were not even any animals in her burning residence, establishing Latocha's callous nature towards the dogs; and 3) many of the dogs had serious maladies. Deputy Ward testified that the situation reminded her of a "puppy mill."

{¶49} Given these facts, we find that the trial court's forfeiture order and the order regarding Latocha not having companion or breeding animals is supported by the evidence. Latocha's claim that the forfeiture of all the French Bulldogs served

no rational purpose is directly contradicted by the facts. Moreover, to the extent that Latocha argues that she should only have to forfeit dogs that were directly subject to violations of R.C. 959.131, this is clearly contradicted by R.C. 959.99(E)(6)(a), therefore this argument is not well-taken. For all these reasons, Latocha's second assignment of error is overruled.

*Conclusion*

**{¶50}** For the foregoing reasons Latocha's assignments of error are overruled and the judgment of the Sidney Municipal Court is affirmed.

***Judgment Affirmed***

**WILLAMOWSKI and ZIMMERMAN, J.J., concur.**

**/jlr**