[Cite as *State v. Bennett*, 2019-Ohio-2996.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27943 |
| | : | |
| v. | : | Trial Court Case No. 17-CRB-5073 |
| | : | |
| CHRISTIANITY I. BENNETT | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of July, 2019.

. . . . . . . . . . .

STEPHANIE L. COOK, Atty. Reg. No. 0067101, City of Dayton Prosecutor's Office, 335 W. Third Street, Room 372, Dayton, Ohio 45402
    Attorney for Plaintiff-Appellee

DAWN S. GARRETT, Atty. Reg. No. 0055565, 70 Birch Alley, Suite 240-24005, Dayton, Ohio 45440
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

TUCKER, J.

{¶ 1} Defendant-appellant, Christianity I. Bennett, appeals from her conviction for one count of assault, a first-degree misdemeanor in violation of R.C. 2903.13(A). Bennett argues that the conviction should be vacated because the conduct for which she was found guilty was a permissible exercise of her right to self-defense; because she was incapable of knowingly causing harm to another person; because the trial court erred by considering hearsay evidence in support of its verdict, and by overruling her motion for acquittal; because she was denied her right to a trial by jury as a result of her defense counsel's failure to render effective assistance; and because the verdict was not supported by the evidence, or was entered contrary to the manifest weight of the evidence. Additionally, Bennett argues that the trial court abused its discretion by sentencing her to a term of 180 days in jail, the maximum term for a first-degree misdemeanor.

{¶ 2} We find that Bennett did not raise the issue of self-defense before the trial court; that the court did not rely on hearsay evidence; that the court received a sufficient quantity of credible evidence to support its verdict; and that Bennett has not substantiated her defense counsel's alleged ineffectiveness by citation to the record. As well, we find that Bennett's sentence was not an abuse of the trial court's discretion, despite the harshness of the requirement that Bennett actually be confined in jail for 60 days of her sentence. The trial court's judgment of conviction is affirmed.

## I. Facts and Procedural History

{¶ 3} An ambulance transported Bennett to Miami Valley Hospital for emergency care on the night of August 3, 2017, after she was apparently struck by a motor vehicle

while walking along the sidewalk in her neighborhood in Huber Heights. Transcript of Proceedings 16:3-16:19 and 88:22-89:19, Jan. 22, 2018. En route, medical technicians placed a cervical collar around Bennett's neck and initiated intravenous therapy. *Id.* at 27:19-28:6.

{¶ 4} Bennett was admitted to Miami Valley Hospital's emergency and trauma center at approximately 10:30 p.m., where Mary Stephens, a registered nurse, affixed a heart monitor to her chest and began assessing her condition. *Id.* at 14:17-15:8, 16:3-16:19 and 27:25-28:13; Appellant's Brief 5; Appellee's Brief 2. The assessment included a series of questions that Bennett answered coherently, and Stephens observed no external injuries, though she noted that Bennett "was covered in dirt and mulch." *See* Transcript of Proceedings 17:10-21:5. In response to one of Stephens's questions, Bennett said that she had been consuming alcohol that evening, which Stephens thought to be the explanation for Bennett's "bloodshot" eyes. *Id.* at 24:13-25:23. Stephens later described Bennett's behavior during the intake process as "mildly cooperative." *Id.* at 21:2-21:5.

{¶ 5} Once Stephens completed this initial assessment, a physician examined Bennett, following which Bennett was taken to the hospital's radiology section for a series of computer assisted tomography scans. *Id.* at 25:9-26:14. After the scans were completed, Bennett was brought back to her room in the emergency and trauma center, at which time Stephens noted that Bennett's cervical collar, heart monitor and intravenous line were still in place. *Id.* at 28:19-28:25. Stephens then left the room to check on other patients while she waited for the radiology section's report on Bennett's condition. *Id.* at 29:1-29:9.

**{¶ 6}** Upon returning to the room, Stephens encountered Bennett trying to leave her bed, having removed the cervical collar, heart monitor and intravenous line. *Id.* at 29:10-14. Stephens cautioned Bennett that she thereby risked injuring herself, but Bennett became "very insistent that she was able to leave and that she should be able to make that decision." *Id.* at 30:5-30:9 and 31:15-31:22. According to Stephens, however, the hospital's policy was to allow the decision to be made only by Bennett's attending physician, who preferred to wait for the radiology report.[1] *Id.* at 32:1-33:14. To prevent Bennett from further interfering with the medical devices attached to her, the attending physician directed Stephens to use "soft restraints," which Stephens described as cushioned or padded straps that are cinched around a patient's wrists. *See id.* at 33:15-35:6. Stephens applied the soft restraints without resistance from Bennett. *Id.* at 35:10-36:1.

**{¶ 7}** Once Stephens left the room, Bennett extricated herself from the soft restraints and removed her cervical collar and heart monitor. *Id.* at 36:16-36:25. Stephens notified Bennett's attending physician, who apparently instructed Stephens to use locked, nylon restraints to immobilize Bennett's wrists and ankles.[2] *Id.* at 37:1-37:22.

---

[1] The presentence investigation report prepared after Bennett's trial suggests that her attending physician was also concerned about her blood alcohol content. At trial, Stephens referred only to the radiology report when she explained the attending physician's reluctance to release Bennett against medical advice. The State did not introduce any evidence to establish Bennett's blood alcohol content, and the presentence investigation report had not yet been prepared when the trial court rendered its verdict.

[2] Whether the attending physician instructed Stephens specifically to immobilize Bennett's ankles is unclear. Stephens testified that after she spoke to the attending physician, Bennett's wrists and ankles were immobilized, and she explained that Bennett's ankles were immobilized because Bennett "began kicking at staff." Transcript of Proceedings 36:19-38:3.

Pursuant to the hospital's policy on the use of locked restraints, Officer Josh Wendling of the campus police department reported to Bennett's room to assist Stephens, along with several other nurses. *Id.* at 38:9-39:3. Bennett resisted, but Stephens, the other nurses and Officer Wendling were able to secure the restraints. *Id.* at 39:4-40:8.

{¶ 8} Eventually, Bennett began to struggle against the restraint on her right wrist with such force that Stephens worried she would dislocate her wrist or otherwise injure herself, so Stephens asked Officer Wendling to help reposition the restraint. *Id.* at 40:21-41:10. To that end, Stephens took hold of Bennett's right arm while Officer Wendling unlocked the restraint, at which point Bennett began pinching "the * * * fat [on the back] of [Stephens's] hands," and when Officer Wendling had nearly finished repositioning the restraint, Bennett "sat up and bit [the upper part of Stephens's] right * * * arm." *Id.* at 41:24-43:4 and 44:10-44:23. Stephens asked Bennett to stop, but because Bennett refused, Officer Wendling physically intervened. *See id.* at 45:10-45:21. Photographs of Stephens's arm taken within 15 minutes of the incident show that the bite did not break her skin, though "a bruise remain[ed] * * * for several days." *Id.* at 45:24-48:1 and Exs. 1-2.

{¶ 9} Afterward, Stephens covered Bennett's mouth with "a spit mask so that she could not attempt to injure anyone else," and a physician ordered that she be sedated. *Id.* at 48:2-48:9. Several hours later, Bennett was deemed fit to be discharged, and she was transported from Miami Valley Hospital to the Montgomery County Jail. *See id.* at 48:10-49:17.

{¶ 10} Bennett was charged with one count of assault under R.C. 2903.13(A), a first-degree misdemeanor. The case was tried to the bench on January 22, 2018, and

the judge found Bennett guilty as charged. At Bennett's sentencing hearing on February 27, 2018, the judge sentenced Bennett to serve a term of 180 days in jail, with 120 days suspended; ordered that she would thereafter be subject to a period of intense, supervised probation with drug and alcohol counseling; and forbade her from returning to Miami Valley Hospital "unless she [were to be] taken there by ambulance." *Id.* at 107:3-107:8. The judge stayed the sentence pending Bennett's appeal, and Bennett timely filed a notice of appeal to this court on March 12, 2018.

## II. Analysis

{¶ 11} For her first assignment of error, Bennett contends that:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IMPLICITLY FOUND THAT DEFENDANT HAD NO RIGHT TO REFUSE MEDICAL TREATMENT AND TO DEFEND HERSELF AGAINST THE UNLAWFUL DETENTION, RESTRAINT, ASSAULT AND BATTERY COMMITTED BY THE MIAMI VALLEY HOSPITAL STAFF WHO REFUSED TO LET HER LEAVE AGAINST MEDICAL ADVICE.

{¶ 12} Bennett argues, in other words, that the trial court erred by finding her guilty of assault because she "had a right to defend herself" against the "forcibl[e] administ[ration] [of] medical treatment" to which she did not consent. Appellant's Brief 15. Thus, Bennett equates her conviction to a finding that Miami Valley Hospital "had a lawful right to restrain [her]" against her will. *Id.*

{¶ 13} R.C. 2903.13(A) prohibits any "person [from] knowingly caus[ing] or attempt[ing] to cause physical harm to another or to another's unborn." In relevant part, R.C. 2901.22(B) establishes that a "person acts knowingly, * * *, when the person is aware

that the person's conduct will probably cause a certain result or will probably be of a certain nature." The intended purpose of the person's conduct is irrelevant. *Id.*

{¶ 14} In Bennett's view, because the "hospital had absolutely no right * * * to restrain [her] against her will," she had the "right to defend herself against such unlawful force." Appellant's Brief 15. Self-defense "is an affirmative defense" for which the "burden of going forward with the evidence, and the burden of proof, * * *, is upon the accused." R.C. 2901.05(A); *see also, e.g., State v. Williford*, 49 Ohio St.3d 247, 249, 551 N.E.2d 1279 (1990). A "real or perceived threat of death or great bodily harm is required * * * for [a person's] use of deadly force to be justified as self-defense," but "when faced with less than impending death or great physical harm," a person "may use such force as the circumstances require [to defend] against such danger as [the person] has good reason to apprehend." *City of Akron v. Dokes*, 31 Ohio App.3d 24, 25, 507 N.E.2d 1158 (9th Dist.1986); *see also State v. Fagan*, 2d Dist. Clark No. 08-CA-52, 2009-Ohio-3760, ¶ 19, citing *Dokes* at syllabus. To justify the use of less than deadly force in self-defense, a defendant must prove, by the preponderance of the evidence, that: (1) she " 'was not at fault in creating the situation which gave rise' " to the event in which the purportedly defensive use of non-deadly force occurred; and (2) she had an honest, reasonable belief that she " 'was in imminent danger of bodily harm' " and that her " 'only means to protect [her]self from such danger was * * * the use of force not likely to cause death or great bodily harm.' "[3] *State v. Allison*, 2d Dist. Montgomery No. 26885, 2016-

---

[3] In the *Fagan* case, we stated that a defendant must prove that she " 'had honest and reasonable grounds to believe that [non-deadly force] was necessary to defend [her]self against <u>the imminent use of unlawful force</u>,' " omitting the reference to the "danger of bodily harm" usually associated with the second element of self-defense. (Emphasis added.) *Fagan* at ¶ 20, quoting *State v. Tanner*, 9th Dist. Medina No. 32580M, 2002-

Ohio-5262, ¶ 19, quoting *State v. Malott*, 2d Dist. Montgomery No. 25420, 2015-Ohio-2968, ¶ 14; *State v. Fritz*, 163 Ohio App.3d 276, 2005-Ohio-4736, 837 N.E.2d 823, ¶ 20 (2d Dist.); *Ohio Jury Instructions*, CR Section 421.21 (Rev. Aug. 16, 2016). The defendant "must prove all [of] these elements to establish self-defense." (Citation omitted.) *State v. Saturday*, 12th Dist. Butler No. CA2018-06-122, 2019-Ohio-193, ¶ 12.

{¶ 15} At trial, Bennett neither claimed that she had acted in self-defense, nor attempted to prove as much, and she consequently waived the defense because she bore the burden of persuasion. *See, e.g.*, *State v. Ireland*, 155 Ohio St.3d 287, 2018-Ohio-4494, 121 N.E.3d 285, ¶ 36; *State v. Montgomery*, 2015-Ohio-4652, 48 N.E.3d 1042, ¶ 13 (12th Dist.). The record did include evidence, in the form of Stephens's testimony, that Bennett expressed a desire to be discharged from Miami Valley Hospital at some point after her admission, but she made no attempt to incorporate that evidence into a defense predicated on her right to use less than deadly force in self-defense. We cannot tax the trial court with error for failing to consider an affirmative defense that Bennett never raised.

{¶ 16} During closing statements, however, Bennett's counsel remarked that Bennett "had a right to resist" because Stephens, Officer Wendling and other Miami Valley Hospital personnel had restrained her "against her wishes." Transcript of Proceedings 96:13-96:18. Assuming strictly for sake of analysis that this lone, oblique reference

---

Ohio-2662, ¶ 21. We presume that the reference to "unlawful force" in *Fagan* was intended to be synonymous with the the term "bodily harm," but even if the term "unlawful force" was intended to include contact of the sort that would support a civil action for battery, we would reach the same conclusion in this case. Bennett testified that she could not remember what, if anything, she believed at the operative moment.

sufficed to raise the issue of self-defense, we find that Bennett could not have met her burden of proof in light of her own testimony. Bennett testified that she "blacked out" when she was struck by a motor vehicle and remembered nothing of being transported to Miami Valley Hospital. Transcript of Proceedings 88:25-89:24. Of the events thereafter, Bennett testified as follows on direct examination:

COUNSEL: Do you know what hospital you were at?

BENNETT: No.

COUNSEL: Do you know when you were at the hospital?

BENNETT: No, I don't know an exact time. No.

COUNSEL: Do you remember anything after the medics attended to you?

BENNETT: The only thing I remember is the neck brace.

COUNSEL: * * * Describe to the judge the neck brace and what it made you feel like.

BENNETT: Well, I came to, and I felt a neck brace on my neck.

COUNSEL: * * * Where were you?

BENNETT: I was in a room with the lights out.

* * *

COUNSEL: Was this a hospital room?

BENNETT: It looked to be like it was a hospital room.

COUNSEL: Was there anybody else around you?

BENNETT: Not that I remember.

* * *

COUNSEL: And what, if anything, did you do with the neck brace?

BENNETT: It was uncomfortable, and I started trying to remove it.

\* \* \*

COUNSEL: And after you tried to remove it, what's the next thing that you remember?

BENNETT: I removed it.   That's all I remember.

\* \* \*

COUNSEL: \* \* \* Do you remember anything else after you removed the neck brace?

BENNETT: Nope.

COUNSEL: Do you remember having an [intravenous line] in your arm?

BENNETT: No.

COUNSEL: Do you remember removing the [intravenous line] from your arm?

BENNETT: No.

\* \* \*

COUNSEL: Do you remember talking to a nurse?

BENNETT: No.

COUNSEL: Do you remember being restrained?

BENNETT: No.

COUNSEL: You don't remember being restrained?

BENNETT: I remember when they braced me, taking it off, and after that I blacked out everything.

\* \* \*

COUNSEL: Do you remember being in soft restraints and then in locked restraints?

BENNETT: No.

COUNSEL: Do you remember biting anyone?

BENNETT: No, sir.

COUNSEL: Pinching anyone?

BENNETT: No, sir.

\* \* \*

COUNSEL: When was the next—what's the next thing you remember after the collar?

BENNETT: I woke up in the county jail.

\* \* \*

COUNSEL: Any idea of what time it was that you woke up?

BENNETT: It was about ten a.m., I believe.

\* \* \*

COUNSEL: Did you know how you got to the jail?

BENNETT: No.

COUNSEL: Do you remember the ride to the jail?

BENNETT: No.

*Id.* at 90:7-93:16.

**{¶ 17}** Bennett's testimony precluded the possibility of her proving that she "had honest and reasonable grounds to believe that [pinching and biting Stephens] was necessary to defend [her]self against the imminent use of unlawful force." *State v.*

*Tanner*, 9th Dist. Medina No. 3258-M, 2002-Ohio-2662, ¶ 21. As a result, she could not have proven that she acted in self-defense. *Id.*; *Saturday*, 12th Dist. Butler No. CA2018-06-122, 2019-Ohio-193, at ¶ 12.

{¶ 18} We find that Bennett waived the defense of self-defense because she did not raise it before the trial court. Assuming in the alternative that Bennett's counsel raised the defense during closing statements, we find that Bennett could not have proven all of the elements of self-defense as a result of her inability to remember the incident in question. Bennett's first assignment of error is overruled.

{¶ 19} We address Bennett's second, fourth and sixth assignments of error together because they implicate the same standard of review. For her second assignment of error, Bennett contends that:

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FOUND DEFENDANT GUILTY OF THE OFFENSE OF ASSAULT BECAUSE EITHER THE DEFENDANT WAS COMPETENT AND COHERENT TO REFUSE MEDICAL TREATMENT OR IF SHE WAS [sic] INCOMPETENT, THEN SHE WOULD BE [sic] INCAPABLE OF THE MENS REA TO BE RESPONSIBLE FOR ASSAULT.

For her fourth assignment of error, Bennett contends that:

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT DENIED DEFENDANT'S MOTION FOR ACQUITTAL.

And for her sixth assignment of error, Bennett contends that:

> THE VERDICT WAS BASED UPON INSUFFICIENT EVIDENCE AND/OR WAS CONTRARY TO THE MANIFEST WEIGHT OF THE

EVIDENCE AND THE TRIER OF FACT CLEARLY LOST ITS WAY.

{¶ 20} Bennett argues in these assignments of error that the State failed to prove that she committed assault. In her second assignment, Bennett claims that the State had to prove that she "knowingly caused or attempted to cause harm to another <u>without</u> <u>lawful justification</u>, such as self-defense." (Emphasis added.) Appellant's Brief 16. In her fourth and sixth assignments, Bennett insists that the State lacked adequate evidence to prove her guilt.

{¶ 21} As noted, R.C. 2903.13(A) prohibits any "person [from] knowingly caus[ing] or attempt[ing] to cause physical harm to another or to another's unborn." Bennett's second assignment of error, then, has no merit because the absence of lawful justification is not an element of the offense, and the State accordingly had no obligation to prove that Bennett lacked a lawful justification for her actions.[4]

{¶ 22} In her fourth assignment of error, Bennett challenges the trial court's decision to overrule her motion for acquittal under Crim.R. 29, and in her sixth, she

---

[4] Bennett did not cite R.C. 2901.05 in her argument. The current version of the statute specifies that the "burden of going forward with the evidence * * * and the burden of proof, by a preponderance of the evidence, for an affirmative defense other than self-defense, defense of another, or defense of the accused's residence * * *, is upon the accused." R.C. 2901.05(A). Under R.C. 2901.05(B)(1), however, "[i]f, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support [the conclusion] that the accused person used the force in self-defense, * * *, [then] the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense." Absent a citation to the statute, we construed Bennett's argument to relate to the elements of the offense of assault itself, but her argument could also be construed to implicate the foregoing. Assuming without finding that the latter would have had merit under the current version of R.C. 2901.05, which took effect on March 28, 2019, the argument has no merit under the version of R.C. 2901.05 in effect on the date of the incident in question, which occurred on August 3, 2017.

challenges her conviction with respect to the sufficiency and weight of the evidence. An appellate court reviews a trial court's ruling on a motion under Crim.R. 29 by the same standard applicable to a challenge based on the sufficiency of the evidence. *State v. Scott*, 2018-Ohio-198, 104 N.E.3d 143, ¶ 37 (2d Dist.), citing *State v. Bailey*, 2d Dist. Montgomery No. 27177, 2017-Ohio-2679, ¶ 17. Sufficiency of the evidence "is the legal standard applied to determine whether * * * the evidence [in a given case] is [adequate] as a matter of law to support the * * * verdict." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997), citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). On review of a challenge to a conviction based upon the sufficiency of the evidence, the " 'relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 23} By contrast, in a challenge based on the weight of the evidence, an appellate court considers not only the quantity of the evidence, but the quality of the evidence, as well. (Citation omitted.) *See State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12; *State v. Thigpen*, 2016-Ohio-1374, 62 N.E.3d 1019, ¶ 6 (8th Dist.). Accordingly, the appellate court must review the record; weigh the evidence and all reasonable inferences; consider the credibility of witnesses; and determine whether in resolving conflicts in the evidence, the factfinder clearly lost its way and created a manifest miscarriage of justice warranting a new trial. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Hill*, 2d Dist. Montgomery No. 25172, 2013-Ohio-717, ¶ 8. A trial court's "judgment should be

reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Hill* at ¶ 8, quoting *Martin* at 175.

**{¶ 24}** Although the appellate court "must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses," the court nevertheless "may determine which of several competing inferences suggested by the evidence should be preferred." (Citation omitted.) *State v. Cochran*, 2d Dist. Montgomery No. 27023, 2017-Ohio-216, ¶ 6. A determination that a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of the sufficiency of the evidence, because "a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citation omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *State v. Miller*, 2d Dist. Montgomery No. 25504, 2013-Ohio-5621, ¶ 48, citing *McCrary* at ¶ 11.

**{¶ 25}** Bennett's fourth and sixth assignments of error are based entirely on the same premise underlying her first and second assignments of error—that she was not guilty of assault because she was acting in self-defense. *See* Appellant's Brief 16 and 20-21. This premise is fundamentally flawed, and otherwise, Bennett makes no attempt to demonstrate that the State failed to introduce sufficient evidence to prove the essential elements of assault, or that the evidence was qualitatively inadequate to support the trial court's verdict. *See id.*

**{¶ 26}** Bennett presupposes that she cannot be guilty of assault if she had the right to defend herself under the circumstances. Yet, "an affirmative defense," such as self-

defense, "is in the nature of a 'confession and avoidance,' in which the defendant admits the elements of the crime, but seeks to prove some additional fact" that negates culpability. *See State v. Rhodes*, 63 Ohio St.3d 613, 625, 590 N.E.2d 261 (1992); *State v. Morefield*, 2d Dist. Montgomery No. 26155, 2015-Ohio-448, ¶ 26-31. Hence, even if Miami Valley Hospital personnel "assaulted [Bennett] and committed a battery against her person by administering medical treatment * * * without [her] consent," the State presented unrebutted testimony at her trial showing that she was aware of the nature of her conduct and that, having such awareness, she caused physical harm to Stephens. Appellant's Brief 21. The State had no obligation to prove anything else. Conversely, had Bennett intended to defend against the charge of assault on the basis of self-defense, then she would have been obligated to raise that issue before the trial court and to present evidence in support. Bennett's fourth and sixth assignments of error are overruled.

**{¶ 27}** For her third assignment of error, Bennett contends that:

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT IMPROPERLY ADMITTED CERTAIN EVIDENCE AND WHEN IT PERMITTED THE STATE TO RELY UPON EXCLUDED HEARSAY.

**{¶ 28}** Here, Bennett argues that the trial court improperly considered testimony offered by Stephens that incorporated statements made by Bennett's attending physician, who did not testify at the trial; that the court improperly permitted Stephens to testify "about what the law in Ohio is regarding whether a patient can leave against medical advice"; and that the court improperly permitted Stephens to testify about statements made by Bennett herself that were privileged under R.C. 2317.02. Appellant's Brief 17. These arguments lack merit.

**{¶ 29}** First, although Stephens repeatedly referred to Miami Valley Hospital's policies and procedures, along with the instructions given her by Bennett's attending physician, the references were not hearsay. For example, when the State asked Stephens whether a patient is "allowed to just be like, hey, against medical advi[c]e, I'm leaving," Stephens answered that "it is up to the physician and their [sic] training, and they [sic] have a set of standards in which they [sic] measure that." Transcript of Proceedings 32:1-32:4. Bennett objected, at the time, that this testimony was hearsay, but Stephens did not attribute any statements to the attending physician. Furthermore, the factual accuracy, or lack thereof, of Stephens's characterization of the hospital's policies was irrelevant because the purpose of the testimony was to explain why Bennett was not allowed to leave against medical advice when she became uncooperative. *See id.* at 29:10-33:4 and 34:6-34:21. In any event, Bennett fails to cite any specific examples of hearsay testimony that the trial court purportedly accepted into evidence, and she therefore has not met her burden as the appellant to demonstrate error in this respect. *See* App.R. 16(A); *Knapp v. Edwards Laboratories*, 61 Ohio St.2d 197, 199-200, 400 N.E.2d 384 (1980); *Camp v. Star Leasing Co.*, 10th Dist. Franklin No. 11AP-977, 2012-Ohio-3650, ¶ 67.

**{¶ 30}** Second, Stephens did not refer to Ohio law when she explained why Bennett was not allowed to leave against medical advice. *See id.* at 31:15-33:14. Instead, Stephens referred to the hospital's policies and procedures, which was neither "testify[ing] to a legal conclusion" nor otherwise improper.

**{¶ 31}** Third, with two exceptions, Bennett waived privilege by failing to object on that basis to Stephens's testimony. The trial court did not err by accepting testimony into

evidence in the absence of any objection, and regarding the two occasions on which Bennett did object on the basis of privilege, Bennett herself offered essentially the same testimony when she took the stand.

{¶ 32} Stephens testified that when Bennett arrived in the emergency and trauma center, "she said [that she had been transported there because] she had been struck by a vehicle," which prompted a privilege-based objection from Bennett. *Id.* at 18:14-19:10. Bennett, however, later testified that "[she] was hit by a car and taken to the hospital." *Id.* at 94:16-95:8. Stephens testified further that Bennett "said she had been drinking," which prompted Bennett's other privilege-based objection, yet when asked subsequently on cross-examination whether she had been "drinking alcoholic beverages that night," Bennett herself answered in the affirmative. *Id.* at 24:13-25:8 and 94:16-95:8. Even if the trial court should have sustained the foregoing objections, any error on the court's part was rendered harmless by Bennett's presentation of the same evidence through her own testimony. Bennett's third assignment of error is overruled.

{¶ 33} For her fifth assignment of error, Bennett contends that:

DEFENDANT WAS DENIED HER CONSTITUTIONAL RIGHTS TO DUE PROCESS, TRIAL BY AN IMPARTIAL JURY, AND EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 34} Bennett argues that her trial counsel was ineffective in two respects. First, she indicates that she "wanted a trial by jury," faulting counsel by implication for failing to submit a jury demand on her behalf. Appellant's Brief 19. Second, she maintains that counsel was ineffective for failing to raise self-defense in answer to the charge of assault. Appellant's Brief 19.

{¶ 35} To prevail on a claim of "ineffective assistance of counsel, a defendant must satisfy the two-pronged test in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." *State v. Cardenas*, 2016-Ohio-5537, 61 N.E.3d 20, ¶ 38 (2d Dist.). The *Strickland* test requires a showing that: "(1) defense counsel's performance was so deficient that [it did not fulfill the right to assistance of counsel] guaranteed under the Sixth Amendment to the United States Constitution; and (2) * * * defense counsel's errors prejudiced the defendant." *Id.*, citing *Strickland* at 687. Judicial "scrutiny of counsel's performance must be highly deferential," so "a [reviewing] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." *Strickland* at 689, citing *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955). To show prejudice, the defendant bears the burden to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of [a given] proceeding would have been different." *Id.* at 694; *State v. Southern*, 2d Dist. Montgomery No. 27932, 2018-Ohio-4886, ¶ 47. A failure "to make either showing defeats" the claim. *Cardenas* at ¶ 38.

{¶ 36} Regarding Bennett's argument that counsel failed to submit a jury demand on her behalf, or even to ask "whether she [preferred] a trial to the bench or [a trial] to a jury," Bennett acknowledges that her avowed preference for the latter "does not appear in the transcript." Appellant's Brief 19. We cannot find that counsel was ineffective for failing to demand a jury on the record before us, because that record is silent on this issue. A "postconviction action, rather than a direct appeal, is the proper mechanism for asserting [a claim] that is based on evidence dehors the record." *State v. Moon*, 8th Dist. Cuyahoga No. 93673, 2014-Ohio-108, ¶ 13, citing *State v. Cooperrider*, 4 Ohio St.3d 226,

228-229, 448 N.E.2d 452 (1983), and *State v. Curtis*, 8th Dist. Cuyahoga No. 89412, 2008-Ohio-916, ¶ 8.

{¶ 37} Regarding Bennett's argument that counsel was remiss for failing to present the defense of self-defense, we find that Bennett cannot prove that she was prejudiced as a result. As we found in our analysis of Bennett's first assignment of error, Bennett's own testimony precluded the possibility of her proving that she had "honest and reasonable grounds to believe that [pinching and biting Stephens] was necessary to defend [her]self against the imminent use of unlawful force." *Saturday*, 12th Dist. Butler No. CA2018-06-122, 2019-Ohio-193, at ¶ 12; *Tanner*, 9th Dist. Medina No. 3258-M, 2002-Ohio-2662, at ¶ 21. Bennett's fifth assignment of error is overruled.

{¶ 38} For her seventh and last assignment of error, Bennett contends that:

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION AND [sic] THE SENTENCE WAS IMPROPER FOR A FIRST OFFENDER WITH NO CRIMINAL HISTORY, NO SIGNIFICANT HARM [sic], AND NO NEED TO PROTECT THE GENERAL PUBLIC OR TO DETER FUTURE MISCONDUCT.

{¶ 39} Finally, Bennett argues that the sentence imposed by the trial court "is such a miscarriage of justice as to go beyond all conception of fairness." Appellant's Brief 21. We agree that the sentence is harsh, but that assessment of itself is insufficient to justify reversal or remand.

{¶ 40} A court pronouncing sentence on "an offender for a misdemeanor [offense] has discretion to determine the most effective way to achieve the purposes and principles of sentencing set forth in [R.C.] 2929.21," except in cases in which: (1) "a mandatory jail

term is required" pursuant to R.C. 1547.99(G), 4510.14(B), 4511.19(G) or "any other provision of the Revised Code"; or (2) "a specific sanction is required or * * * precluded" by "any provision of [R.C.] 2929.23 to 2929.28," or by that section of the Revised Code which establishes the nature of the "offense or [specifies] the penalty for [the] offense." R.C. 2929.22(A). The court, further, may not "impose a sentence that [places] an unnecessary burden on local government resources." *Id.*

{¶ 41} According to R.C. 2929.21 a court "shall be guided by the overriding purposes of * * * protect[ing] the public from future crime by the offender and others" and "punish[ing] the offender." R.C. 2929.21(A). This requires that the court "consider the impact of the offense upon the victim," along with "the need for changing the offender's behavior, rehabilitating the offender, and making restitution." *Id.* Additionally, a misdemeanor sentence "shall be reasonably calculated to achieve the two overriding purposes of misdemeanor sentencing," while being "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar offenses committed by similar offenders." R.C. 2929.21(B).

{¶ 42} Under R.C. 2929.22(B)(1), when "determining the appropriate sentence for a misdemeanor," a court must consider: the "nature and circumstances of the offense"; whether the offender is likely to "commit another offense"; whether there is "a substantial risk" that the offender "will be a danger to others"; whether certain characteristics of the victim "made the victim particularly vulnerable to the offense or made the impact of the offense more serious"; and whether the offender is a veteran of the armed forces, and if so, whether the offender's experiences in the armed forces produced "an emotional,

mental, or physical condition" that was "a contributing factor in the offender's commission of the offense." An appellate court reviews a misdemeanor sentence for an abuse of discretion. (Citation omitted.) *State v. Fankle*, 2015-Ohio-1581, 31 N.E.3d 1290, ¶ 18 (2d Dist.), citing *State v. Peagler*, 2d Dist. Montgomery No. 24426, 2012-Ohio-737, ¶ 3; *see also State v. Horton*, 2017-Ohio-8549, 99 N.E.3d 1090, ¶ 36 (10th Dist.).

**{¶ 43}** The jail sentence imposed by the trial court in Bennett's case is within the range authorized by R.C. 2929.24(A)(1), which states that a jail term for a first disagree misdemeanor shall be "not more than [180] days." As such, the sentence is not contrary to law. *State v. Farmer*, 5th Dist. Licking No. 15 CA 0044, 2015-Ohio-5434, ¶ 92-94. The trial court explained that it imposed the sentence because it did not believe that Bennett's testimony was entirely truthful; because Bennett harmed, albeit only slightly, a person "who was just trying to do her job"; and because the presentence investigation report suggested that Bennett might have a tendency to commit crimes in the future as the result of alcohol abuse. *See* Transcript of Proceedings 106:9-106:23. Despite the harshness of the court's decision to require Bennett to spend 60 days actually confined in jail, as opposed to suspending the whole sentence, the overall term of 180 days falls within the statutory range, and the rationale offered by the court indicates that the court gave at least perfunctory consideration to the applicable statutory factors. On this record, we cannot find that the sentence imposed by the trial court constituted an abuse of discretion. Bennett's seventh assignment of error is overruled.

### III. Conclusion

**{¶ 44}** We find that Bennett did not raise the issue of self-defense before the trial court; that the court did not rely on hearsay evidence; that the court received a sufficient

quantity of credible evidence to support its verdict; that the judgment was not against the weight of the evidence; and that Bennett has not substantiated her defense counsel's alleged ineffectiveness by citation to the record. As well, we find that Bennett's sentence, though it included the relatively harsh requirement that Bennett spend 60 days confined in jail, was not an abuse of the trial court's discretion. Bennett's conviction is affirmed.

. . . . . . . . . . . .

WELBAUM, P.J. concurs.

FROELICH, J., dissents:

{¶ 45} I agree that Bennett's conviction was based on sufficient evidence. However, I would conclude that Bennett adequately raised the affirmative defense of self-defense and that her conviction was against the manifest weight of the evidence.

{¶ 46} The trial court did not lose its way in concluding that Bennett knowingly caused physical harm to Stephens. Stephens testified that Bennett responded appropriately to questions, was generally cooperative prior to her being restrained (the exception being when Bennett was insistent that she needed to urinate), did not lose consciousness, and did not show signs of impairment. Although the defense attempted to suggest through cross-examination of Stephens and through Bennett's testimony that Bennett may have been suffering from a concussion, the trial court was free to credit Stephens's testimony and to disbelieve Bennett's.

{¶ 47} At trial, Bennett argued that her actions were justified, because the hospital was not legally entitled to restrain her. Although she did not explicitly claim that she was asserting the affirmative defense of self-defense, her closing argument at trial raised that

defense. Specifically, defense counsel argued: "* * * Now if she was lucid enough to know what she was doing then she was lucid enough to leave against medical advice and then * * * if she is (inaudible) enough to make that decision then their restraint of her was against – without her permission. It was against her wishes and she had a right to resist it." (Tr. at 96.) The State responded in its closing argument that, in light of Bennett's testimony, there was no basis for a claim that Bennett "needed to defend herself against the officer and the nurse's actions in this particular matter."

**{¶ 48}** To establish self-defense for the use of less than deadly force in defense of one's person, the defendant was required to prove: (1) he or she was not at fault in creating the situation that gave rise to the event in which the use of non-deadly force occurred; (2) he or she had honest and reasonable grounds to believe that such conduct was necessary to defend against the imminent use of unlawful force; and (3) the force used was not likely to cause death or great bodily harm.[5] *State v. Belcher*, 2d Dist. Montgomery No. 24968, 2013-Ohio-1234, ¶ 34. Without minimizing the injury sustained by Stephens, there is no legal dispute that Bennett's actions were not likely to cause death or great bodily harm to Stephens.[6]

**{¶ 49}** Bennett claims that the evidence at trial established that Miami Valley

---

[5] As noted in the majority opinion, R.C. 2901.05(B), addressing self-defense, was amended effective March 28, 2019. This standard reflects the law in effect at the time of the offense and trial.

[6] "In the context of non-deadly force self-defense, the concepts of 'great bodily harm' and 'serious physical harm' are substantially similar." (Citations omitted.) *In re J.J.*, 5th Dist. Licking No. 16CA44, 2016-Ohio-8567, ¶ 15. The phrase "serious physical harm to persons" includes harm that involves a substantial risk of death, permanent incapacity or temporary substantial incapacity, permanent disfigurement or temporary serious disfigurement, prolonged or intractable pain, or a mental illness that would normally require hospitalization or prolonged psychiatric treatment. R.C. 2901.01(A)(5).

Hospital – including Stephens and Wendling, specifically – lacked a lawful basis to restrain her. She asserts that R.C. Chapter 5122, which addresses the hospitalization of mentally ill individuals, provides the only grounds under which a hospital may restrain a patient against that person's will. She references the statutes for unlawful restraint (R.C. 2905.03) and assault (R.C. 2903.13) to demonstrate the unlawfulness of the hospital employees' conduct, and she argues that a doctor commits battery when he or she treats a patient without informed consent.

{¶ 50} The State responds that Bennett was the initial aggressor, who "was under the influence of alcohol and began to engage in drunk and disorderly behavior." The State claims that "[a]t no time did [Bennett] ever verbalize to the medical staff that she wanted them to stop treating her. The fact that [Bennett] stated that she wanted to leave, in and of itself, was insufficient to justify the aggressive actions engaged in by [her] that evening."

{¶ 51} "Every competent adult has a right to decide what is done to his or her body." *Miller v. MetroHealth Med. Ctr.*, 8th Dist. Cuyahoga No. 106104, 2018-Ohio-1202, ¶ 13; *see Steele v. Hamilton Cty. Community Mental Health Bd.*, 90 Ohio St.3d 176, 181, 736 N.E.2d 10 (2000) ("Our belief in the principle that '[e]very human being of adult years and sound mind has a right to determine what shall be done with his own body' * * * is reflected in our decisions."). "The right to refuse medical treatment is a fundamental right in our country, where personal security, bodily integrity, and autonomy are cherished liberties. These liberties were not created by statute or case law. Rather, they are rights inherent in every individual." *Steele* at 180-181.

{¶ 52} The Eighth District has articulated the following general principles regarding

a patient's consent to medical treatment:

> (1) a physician who treats a patient without informed consent commits a battery, even if the treatment is harmless or beneficial; (2) absent legislation to the contrary, the patient's right to refuse medical treatment is absolute until the quality of competing interests is weighed in a court proceeding; (3) if a patient is not competent to consent to medical treatment, an authorized person may consent on the patient's behalf; (4) the patient's consent will be implied if the patient is unable to consent and there exists an emergency requiring immediate action to preserve the life or health of the patient; (5) consent to emergency medical treatment will not be implied if the patient has refused treatment in a manner that satisfies the same standards of knowledge and understanding required for informed consent;[7] and (6) the existence of consent to medical treatment is a question of fact.

*Maglosky v. Kest*, 8th Dist. Cuyahoga No. 85382, 2005-Ohio-5133, ¶ 25, citing *Estate of Leach v. Shapiro*, 13 Ohio App.3d 393, 469 N.E.2d 1047 (9th Dist.1984). *But see Allore v. Flower Hosp.*, 121 Ohio App.3d 229, 237, 699 N.E.2d 560 (6th Dist.1997) (questioning whether a refusal of treatment must be an informed refusal, as expressed in *Leach*, and whether R.C. Chapter 2133 superseded *Leach* regarding refusal of life support measures).

{¶ 53} The State's assertion that Bennett never communicated that she wanted to

---

[7] Under the facts before us, it is not necessary to decide whether a patient's refusal of treatment must be an informed refusal. Even if "informed refusal" were required, Stephens testified that she told Bennett that she (Bennett) had to remain until her test results came back; there is no evidence that Bennett was unable to evaluate whether to leave without the results.

discontinue treatment is belied by the record. Stephens testified that Bennett removed her IV and cardiac monitor and repeatedly removed her surgical collar while informing hospital staff that she wanted to leave. Stephens testified that, prior to the placement of any restraints, Bennett was "very insistent that she was able to leave and that she should be able to make that decision." (Tr. at 31.) Bennett told Stephens that she (Bennett) knew her body and felt fine. After soft restraints were placed, Bennett again told Stephens that she wanted to leave, and Bennett removed the cervical collar. While nurses and officers were placing locked restraints on Bennett, Bennett continued to say that she wanted to leave. In short, Bennett repeatedly indicated through her actions and her words that she wanted to discontinue her medical care, that she did not believe she needed additional care, and that she wanted to leave the hospital.

{¶ 54} In addition, the State presented no evidence to justify the medical staff's refusal to allow Bennett to leave against medical advice and its decision to restrain her to prevent her from leaving. Stephens testified that patients must give consent to treatment, that patients can revoke their consent to treatment, and that Bennett had attempted to revoke her consent to treatment. Stephens was aware of other patients who had been discharged against medical advice.

{¶ 55} Stephens testified that the patient's physician determines when a patient has the "capacity" to decline treatment, and that Bennett's physician determined that Bennett could not leave. However, the primary reason provided for why Bennett could not leave – and the one argued by the State in closing argument – was that the medical staff was concerned for Bennett's safety and her potential injuries. At one point, Stephens testified that Bennett's physician would not allow her to leave due to Bennett's

being "under the influence," but there was no evidence that Bennett was intoxicated; the trial court disallowed evidence of Bennett's blood alcohol levels, and Stephens testified that she saw no indicia consistent with intoxication other than Bennett's bloodshot eyes, which Stephens stated could have been the result of circumstances other than intoxication.

{¶ 56} Bennett did not engage in any aggressive behavior prior to the forcible placement of locked restraints. Bennett's physician, who made the decision not to allow Bennett to leave, was not called as a witness, and Stephens's observations of Bennett indicated that Bennett was competent to leave against medical advice. With the record before us, the State failed to provide any evidence to support the decision to force Bennett to remain at the hospital; the evidence thus demonstrated that Bennett was not at fault in creating the situation that gave rise to the event in which the use of non-deadly force occurred, thus satisfying the first element of self-defense.

{¶ 57} The State further asserts that Bennett failed to establish the second prong of self-defense, i.e., that she had an honest and reasonable ground to believe that her conduct was necessary to defend herself against the imminent use of unlawful force by hospital staff. The term "unlawful" has no statutory definition in Ohio. However, some courts, such as the Tenth District, have defined it as "that which is not in accordance with law." *E.g., Wehr v. Div. of Oil and Gas Resource Mgmt.*, 10th Dist. Franklin Nos. 17AP-855, 17AP-861, 2018-Ohio-5247, ¶ 13; *see also State v. Cress*, 112 Ohio St.3d 72, 2006-Ohio-6501, 858 N.E.2d 341, ¶ 42 (an "unlawful threat of harm" is satisfied when making the threat "violates established criminal or civil law"). "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against

a person or thing." R.C. 2901.01(A)(1). There is no doubt that Bennett was forced to stay at the hospital, and for the reasons stated above, I would find that the evidence weighed heavily that such force was not authorized by law.

{¶ 58} Suffice it to say, I would not find that the "unlawful force" that Bennett was resisting was or had to be a criminal violation, nor would I find that the nurses or officers were acting unlawfully as that term is customarily understood. Moreover, it is not even necessary for Stephens and Wendling to have engaged in "unlawful force"; rather, Bennett was required to have reasonable grounds to believe and an honest belief, even if mistaken, that some force was necessary to defend herself against the imminent use of what *she* honestly and reasonably believed to be unlawful force. *See, e.g., In re J.S.*, 5th Dist. Delaware No. 18 CAF 06 0043, 2019-Ohio-35, ¶ 32; *State v. Coleman*, 2d Dist. Montgomery No. 27666, 2018-Ohio-1951, ¶ 13.

{¶ 59} Since Bennett testified that she did not remember striking, pinching, or biting Stephens, her own testimony did not establish that she had honest and reasonable grounds to believe that her conduct was necessary to defend against the imminent use of unlawful force, i.e., the tightening of her locked restraints by Stephens and Wendling. Regardless, the trial court did not believe Bennett's testimony.

{¶ 60} Accepting the State's version of events, the State's evidence established that Bennett had honest and reasonable grounds to believe that, by restraining her against her will, the hospital personnel (while no doubt acting in good faith and at a physician's direction) were not acting in accordance with the law, which gives a competent patient the right to refuse medical treatment "even if the treatment is harmless or beneficial." *Maglosky*, 8th Dist. Cuyahoga No. 85382, 2005-Ohio-5133, at ¶ 25. Both

Stephens's and Wendling's testimony established Bennett had an honest and reasonable ground to believe that she was physically able and entitled to leave the hospital.

{¶ 61} Although Bennett was brought to the hospital with an IV and cervical collar due to a reported hit-and-run accident, she had no external injuries, was conscious, and did not fall in and out of consciousness; she answered questions appropriately and did not exhibit possible signs of intoxication, other than having bloodshot eyes. There was no evidence that an emergency existed requiring immediate action to preserve her life or health or that Bennett had specific injuries that would have precluded her from leaving against medical advice. Stephens testified that Bennett repeatedly told her – prior to any use of force by Bennett – that she (Bennett) knew her body, that she felt fine, that she believed that she could determine for herself whether she could leave, and that she wanted to leave. Bennett's actions in removing her IV and cervical collar were consistent with these assertions.

{¶ 62} Stephens's and Wendling's testimony further established that Bennett began resisting when hospital personnel attempted to place her in locked restraints; at this time, however, Bennett did not assault anyone. Bennett struggled against the locked restraints when they were in place. Bennett ultimately used force against Stephens while Stephens was holding Bennett's right arm as Officer Wendling was tightening the locked restraint on Bennett's right wrist. Bennett's actions were directly related to the restraining force: Bennett pinched the hand and bit the arm that were holding her right arm. Officer Wendling testified that Bennett had said many times that she wanted to leave.

{¶ 63} In short, the State's evidence established that Bennett was not at fault in creating the situation that gave rise to her use of non-deadly force, and that she used

force that was not likely to cause death or great bodily harm. In addition, the evidence established that Bennett had a reasonable and honest belief that she had a right to leave against medical advice, that the use of restraints against her by hospital personnel was not authorized by law, and that her use of force was necessary to defend herself against that force, i.e., the restraint of her right arm and the tightening of the locked restraint on her right wrist.

{¶ 64} At the time of the offense and trial, Bennett bore the burden of proving self-defense. *E.g., State v. Schooler*, 2018-Ohio-3295, 118 N.E.3d 467, ¶ 39 (2d Dist.). However, the fact that Bennett herself did not testify specifically in support of a self-defense argument did not necessarily require a rejection of the defense. In a manifest-weight analysis, when a witness for the State presents evidence that is favorable to the defense (either by undermining the State's case or by supporting an affirmative defense), we need not ignore the evidence simply because it was not offered as part of the defendant's case-in-chief. *Accord State v. Bowshier*, 2d Dist. Clark No. 06-CA-41, 2007-Ohio-5364, ¶ 72 (defendant's conviction for possession of cocaine found in bedroom was against the manifest weight of the evidence when the State's own witness testified that the cocaine had no relation to defendant). Here, the State presented sufficient evidence that Bennett knowingly assaulted Stephens. However, Stephens's and Wendling's testimony also supported a conclusion that Bennett did so to defend herself against what she believed to be unlawful restraint. Based on the specific record before us, I would conclude that the manifest weight of the evidence established that Bennett acted in self-defense when she assaulted Stephens.

. . . . . . . . . . . . .

Copies sent to:

Stephanie L. Cook
Dawn S. Garrett
Hon. Daniel G. Gehres